# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

```
RAFAEL MUESES POPOTE,          )  Case No. 5:22-cv-04773-JHS
                               )
              Petitioner,      )  Courtroom 13A
                               )  U.S. Courthouse
v.                             )  601 Market Street
                               )  Philadelphia, PA 19106
SUPERINTENDENT LEE             )
ESTOCK, et al.,                )
                               )  February 5, 2025
              Respondents.     )  10:54 a.m.
```

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE HONORABLE JOEL H. SLOMSKY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Petitioner:           Law Office of Mark Greenberg
                              By:  MARK S. GREENBERG, ESQ.
                              651 E. Township Line Road
                              Number 81
                              Blue Bell, PA 19422

For the Respondent:           Berks County District
                              Attorney's Office
                              By:  ALISA R. HOBART, ESQ.
                              633 Court Street
                              5th Floor
                              Reading, PA 19601-4317

ESR Operator/Deputy Clerk:    Jimmy Cruz

TRANSCRIPTION SERVICE:        TRANSCRIPTS PLUS, INC.
                              435 Riverview Circle
                              New Hope, Pennsylvania 18938
                              215-862-1115
                              CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
Produced by transcription service.

2

<u>INDEX</u>

<u>WITNESSES  FOR  PETITIONER</u>                                    <u>PAGE</u>

RAFAEL MUESES POPOTE
 Direct Examination by Mr. Greenberg                     7
 Cross-Examination by Ms. Hobart                        13

<u>WITNESSES FOR RESPONDENT</u>                                    <u>PAGE</u>

JACQUELIN HAMER
 Direct Examination by Ms. Hobart                       17

KENNETH KELECIC
 Direct Examination by Ms. Hobart                       23
 Cross-Examination by Mr. Greenberg                     48
 Redirect Examination by Ms. Hobart                     65
 Examination by the Court                               66
 Further Redirect Examination by Ms. Hobart             68
 Further Recross-Examination by Mr. Greenberg           70
 Further Redirect Examination by Ms. Hobart             71


<u>PETITIONER'S EXHIBITS</u>                          <u>ID</u>    <u>EVID</u>

14   News Article                                11     73

<u>RESPONDENT'S EXHIBITS</u>                          <u>ID</u>    <u>EVID</u>

D-1   Statement (Contreras)                      30     73
D-2   Statement (Baez Betances)                  33     73
D-3   Email (Kelecic/Troy)                       44     73
D-4   Court Docket (Contreras)                   45     73
D-16 Plea sheet (Baez-Betances)                  41     73

```
 1           THE CLERK:  All rise.  The United States District
 2  Court for Eastern District of Pennsylvania is now in session.
 3  The Honorable Joel Slomsky presiding.
 4           THE COURT:  Please be seated.  Sign-in sheet?  Let's
 5  see.  All right, this is the case of Rafael -- I hope I
 6  pronounced this correctly -- Mueses Popote versus
 7  Superintendent Lee Estock, et al., Civil Action Number 22-4473.
 8           On behalf of Mr. Popote, we have Mark Greenberg,
 9  Esquire in court; welcome.
10           MR. GREENBERG:  Good morning, Your Honor.
11           THE COURT:  And I note the presence of Mr. Popote.
12  And I hope I'm pronouncing that correctly, too.
13           MR. GREENBERG:  I think it's Popote.
14           THE COURT:  Popote?
15           MR. GREENBERG:  Popote.
16           THE COURT:  Popote.  All right, thank you.
17           And the Government is represented by Allison [sic]
18  Hobart, Esquire.  Welcome.
19           MS. HOBART:  Yes, Your Honor.  Alisa Hobart, yes.
20           THE COURT:  Yes.  When I say "the Government," I mean
21  the defendants are represented by Ms. Hobart.
22           MS. HOBART:  Correct, Your Honor.  My appearance is
23  entered on behalf -- on -- specifically on behalf of the
24  District Attorney of Berks County.
25           THE COURT:  District Attorney, okay.
```

1          And I note we have an interpreter here, and the

2    interpreter is -- let me see if I get this name right, Mercedes

3    Allongo?

4          INTERPRETER ALLONGO:  Yes, Your Honor; good morning.

5    There's two interpreters, Judge.

6          THE COURT:  Wait, I'm sorry.  There are two

7    interpreters?

8          INTERPRETER ALLONGO:  Yes, Your Honor.

9          THE COURT:  All right.  Are you going to switch, or

10   are we going to have just --

11         INTERPRETER ALLONGO:  We will switch, Your Honor,

12   like every 30 minutes.

13         THE COURT:  All right, so the -- we have two

14   interpreters.  We have Mercedes Allongo and Michael Zogby.

15         INTERPRETER ZOGBY:  Good morning, Your Honor.

16         THE COURT:  Good morning.  Let's have both

17   interpreters sworn.

18         THE CLERK:  Would you please raise your right hand?

19    MERCEDES ALLONGO, INTERPRETER, SWORN TO INTERPRET ENGLISH TO

20                            SPANISH

21    MICHAEL ZOGBY, INTERPRETER, SWORN TO INTERPRET ENGLISH TO

22                            SPANISH

23         THE CLERK:  Please state your names for the record.

24         INTERPRETER ALLONGO:  Mercedes Allongo, A-L-L-O-N-G-

25   O.

1          INTERPRETER ZOGBY:  Michael Zogby.  That last name is

2     spelled Z as in zebra, O-G, as in good, B, as in boy, Y.

3          THE COURT:  All right.  Now, who is going to begin

4     the interpretation?

5          INTERPRETER ZOGBY:  I am, Your Honor.

6          THE COURT:  All right, that's Mr. Zogby.

7          INTERPRETER ZOGBY:  Correct, Your Honor.

8          THE COURT:  All right, you can be seated.

9          All right.  And my first question is to Mr. Popote.

10    Have you been able to understand the Spanish interpretation of

11    Mr. Zogby, and been able to follow everything I've said so far?

12          MR. POPOTE:  Yes, Your Honor.

13          THE COURT:  All right, then we will proceed.

14          Counsel, how do you wish to proceed?

15          MR. GREENBERG:  Your Honor, I would like to call Mr.

16    Popote to testify first.  That will be my only witness.

17          I anticipate Commonwealth counsel will then call Mr.

18    Kelecic and Ms. Hamer, and I think that will complete the

19    record from the standpoint of witness testimony.  Of course,

20    Commonwealth counsel can correct me if I am wrong.

21          THE COURT:  All right.

22          MS. HOBART:  I believe that is correct, Your Honor.

23    At the last proceeding, we did agree -- Mr. Greenberg and I

24    agreed that I would present the testimony of Mr. Kelecic and

25    Ms. Hamer on direct, which would give him the ability to cross.

1          THE COURT:  Okay.

2          MR. GREENBERG:  And --

3          THE COURT:  So, let's --

4          MR. GREENBERG:  And the only -- I'm not going to ask

5  for the attorneys -- the witnesses for the Commonwealth to be

6  excluded now, but when either of them testify, I would ask that

7  there be a sequestration with respect to the Commonwealth

8  witnesses.

9          THE COURT:  All right.

10          MS. HOBART:  Understood, Your Honor.  I'm willing to

11  comply.

12          THE COURT:  Okay.  We'll follow that procedure.

13          MR. GREENBERG:  Thank you, Your Honor.

14          If I may call Mr. Popote?

15          THE COURT:  Yes.   All right, Mr. Popote, you could

16  take the witness stand.

17          THE CLERK:  Mr. Popote, would you please raise your

18  right hand?

19            RAFAEL MUESES POPOTE, DEFENDANT, SWORN

20          THE CLERK:  Please state your name for the record.

21          THE WITNESS:  Rafael Mueses Popote.

22          THE CLERK:  Thank you.

23          MR. GREENBERG:  May --

24          THE COURT:  You may proceed.

25          MR. GREENBERG:  Thank you, Your Honor.

1                         DIRECT EXAMINATION

2  BY MR. GREENBERG:

3  Q     Mr. Popote, good morning.

4  A     Good morning.

5  Q     Mr. Popote, in 2015, were you arrested for a number of

6  charges, including corrupt organizations and possession with

7  the intent to deliver controlled substances?

8  A     Yes.

9  Q     And did you have a trial in 2017?

10 A     Yes.

11 Q     And did that trial result in a verdict of guilty by a jury

12 on February the 2nd, 2017?

13 A     Yes.

14 Q     I'm going to ask you some questions later on about that

15 case, but I first want to talk about your background and your

16 facility with the English language.  Is that -- is that okay?

17 A     Yes.

18 Q     Mr. Popote, were you born in the United States?

19 A     No.

20 Q     What country were you born in?

21 A     Dominican Republic.

22 Q     And when you were living in the Dominican Republic, what

23 language did you speak?

24 A     Spanish.

25 Q     Did you speak any English while you lived in the Dominican

1  Republic?

2  A    No.

3  Q    When did you come to the United States?

4  A    2008.

5  Q    And when you came to the United States in 2008, did you

6  come with any family members?

7  A    Yes.

8  Q    Who were those family members you came with in 2008 to the

9  United States?

10  A    Well, my sister, and my mom was already here, and other

11  family members, my grandparents, uncles, aunts.

12  Q    And back in 2015, did your family members speak English or

13  did they speak Spanish?

14  A    Well, we can say that some of them spoke English, but most

15  of them spoke mostly Spanish.

16  Q    Okay.  Now, at your trial in -- at your trial in 2017, did

17  you have a Spanish interpreter?

18  A    Yes.

19  Q    And why did you have a Spanish interpreter?

20  A    Because I couldn't speak English well or understand the

21  language spoken in court.

22  Q    Now, before your verdict of guilty on February the 2nd,

23  2017, were you out on bail and free to come and go to the

24  trial?

25  A    Yes.

1  Q     And when the verdict of guilty was entered on February the

2  2nd, 2017, did the judge immediately revoke your bail?

3  A     Yes.

4  Q     And when the judge revoked your bail, where did you go?

5  A     County prison.

6  Q     And would that be the Berks County Prison?

7  A     Yes.

8  Q     And is that in Reading, Pennsylvania, or that area?

9  A     Yes, in Reading.

10 Q     And you were sentenced in this case on February the 17th

11 of 2017, is that true?

12 A     Yes.

13 Q     And between the time that you were put in prison on

14 February the 2nd, 2017, and your sentencing on February the

15 17th, 2017, did you have access to any computers?

16 A     Ask me again.  Are you referring to the County?

17 Q     Yes.  When you were in County prison between February 2nd

18 and your sentencing date of February the 17th of 2017, did you

19 have access to any computers?

20 A     Not as far as I could recall.

21 Q     And when you were sentenced on February the 17th, 2017,

22 were you sentenced to approximately 26 years to 55 years

23 incarceration?

24 A     Yes.

25 Q     And you were transferred after your sentence to State

                              Popote - Direct                        10

1   prison?

2   A     Yes.

3   Q     And you are currently in State prison?

4   A     Yes.

5   Q     Between the time you were sentenced to State prison on

6   February the 17th, 2017, and today's date, which is -- well,

7   let me back up.  Between February the 17th, 2017 and August 19,

8   2021, did you have access to any computers that would provide

9   you with news from the outside?

10  A     Not as far as I can recall.

11  Q     Okay.  At some point, Mr. Popote, on or about November the

12  11th, 2022, were you told that a person by the name of Rafael

13  Contreras had been sentenced in connection with your case?

14  A     Yes.

15  Q     Was Rafael Contreras a witness who testified against you

16  in your case?

17  A     Yes.

18  Q     And at some point, did you hire a lawyer by the name of

19  Cheryl Sturm?

20  A     Yes, my family hired him -- her.

21  Q     And did Ms. Sturm meet with you on or about November the

22  11th, 2022, and show you a copy of a computer article about

23  Rafael Contreras?

24          MS. HOBART:  Objection, Your Honor; leading.

25          THE COURT:  I'll overrule the objection.

1          MR. GREENBERG:  May I approach the witness, Your

2    Honor?

3          THE COURT:  Yes.

4          INTERPRETER ZOGBY:  Your Honor, for the record, the

5    last answer was yes.

6    BY MR. GREENBERG:

7    Q    Mr. Popote, I am showing you what has been docketed in

8    this Court as Document Number 14.  Please take a look at that

9    document and let me know when you have done -- when you have

10   finished doing so.

11                         (Pause)

12   A    Okay.

13   Q    Mr. Popote, is that the computer-generated news article

14   that was shown to you by Ms. Sturm in November of 2022?

15   A    Yes.

16   Q    And we've already talked about your access to computers,

17   or the lack thereof, between the time you were locked up in

18   State custody until August 19, 2021.  My question to you now

19   is, did you have access to any computers that had news of the

20   outside world between August 19, 2021 and November the 11th,

21   2022 when you were made aware of this article?

22   A    No.

23   Q    And I want to be clear about the date that these -- this

24   article was published in the Internet.  Do you see the word

25   "published" on that article underneath the Reading Eagle name?

Popote - Direct                                   12

1  A    Yes.

2  Q    And does that indicate that the article was first

3  published on February 15, 2017, at midnight, 12 a.m.?

4             MS. HOBART:  Your Honor --

5  A    Yes.

6             MS. HOBART:  Your Honor, the Commonwealth will agree

7  that the document speaks for itself.  This witness has no

8  direct knowledge of when this article was published.

9             MR. GREENBERG:  Well, I agree with that.  I just want

10  to make it plain that at the time it was published on February

11  15, 2017, and updated on August 19, 2021, he was either in

12  State custody, County custody, without access to a computer

13  that had news articles of the outside world.  If the

14  Commonwealth will agree with that, I will dispense with any

15  other questions in that regard.

16             MS. HOBART:  Your Honor, I think those questions have

17  already been asked and answered of this witness.

18             THE COURT:  All right.  I mean, the article is what

19  he saw on 11/11/22, and it states what it states.

20             MR. GREENBERG:  Thank you, Your Honor.

21  BY MR. GREENBERG:

22  Q    So, Mr. Popote, I want to ask you, are you innocent of the

23  charges that you were convicted of, and charged with, and

24  convicted of on February 17th, 2017?

25  A    Yes.

1          MR. GREENBERG:  Thank you, Mr. Popote.  Your witness.

2          THE COURT:  All right.  Cross-examination?

3          MS. HOBART:  Thank you, Your Honor.

4                     CROSS-EXAMINATION

5    BY MS. HOBART:

6    Q    Mr. Popote, at the time that your case went to trial in

7    2017, you were represented by John Fielding, correct?

8    A    Yes.

9    Q    Okay.  That was your -- that was your attorney of record?

10   A    Yes.

11   Q    Okay.  And Mr. Fielding also represented you at the time

12   that you were sentenced approximately two weeks later, correct?

13   A    Yes.

14   Q    You did appeal from that conviction and sentence, correct?

15   A    Yes.

16   Q    Okay.  And when you filed your appeal from the conviction

17   and sentence, you were represented by John McMahon, correct?

18   Jack McMahon?

19   A    Yes.

20   Q    And would you agree that if the record indicates that your

21   appeal was timely filed, then your appeal was filed timely?

22          MR. GREENBERG:  I don't even understand that

23   question.

24          MS. HOBART:  Okay.

25   Q    If the record indicates, Mr. Popote, that if the appeal

1  that Mr. McMahon filed for you was timely, do you have any

2  reason to dispute that?

3  A    Can you ask me that again?

4          MR. GREENBERG:  Your Honor, I will stipulate that the

5  docket entries reflect the time of filings of the various

6  documents.  Given the fact that Mr. Popote was either in County

7  custody or State custody during the pendency of his appeals,

8  PCRAs, or anything else, he's not going to have any knowledge

9  of when these documents were filed.  The dockets will speak for

10  themselves.

11          I don't think there's going to be any dispute about

12  the fact as to the timeliness or non-timeliness of certain

13  filings in this case.

14          THE COURT:  Are the -- is the state court docket part

15  of the record?

16          MS. HOBART:  Yes, Your Honor, it is.

17          THE COURT:  So, I could look at that, can't I, and

18  see the date that the appeals were filed and decisions were

19  rendered by the appellate courts?

20          MS. HOBART:  I agree, Your Honor.

21          THE COURT:  All right.  And, you know, I take it from

22  what Mr. Greenberg is saying, that this witness would know that

23  the appeals were pursued, but he may not have been focusing on

24  the exact date that documents were filed, and whether or not,

25  under the law, they were timely.

1          So, I think with that, we can move on, unless there's

2    any other questions in that regard based upon what I said.

3          MS. HOBART:  I understand, Your Honor.

4    BY MS. HOBART:

5    Q    Mr. Popote, you were represented by Jack McMahon

6    throughout your appeals, correct?

7    A    Yes.

8    Q    All right.  And you appealed to Superior Court?

9    A    Yes.

10   Q    Okay.  And that appeal was not successful, correct?

11   A    Yes.

12   Q    Okay.  And then Mr. McMahon filed a petition for allowance

13   of appeal to the Supreme Court on your behalf, isn't that

14   correct?

15   A    Yes.

16   Q    Okay.  And that petition was not successful either,

17   correct?

18   A    Yes.

19   Q    Okay.  And when that petition to the Supreme Court was not

20   successful, that ended Mr. McMahon's representation of you,

21   correct?

22   A    Yes.

23   Q    And your next contact with any counsel was when Ms. Sturm

24   contacted you about the newspaper article that you were just

25   shown, Document Number 14, correct?

1  A    In 2021, I believe somebody had contacted me about that

2  person, and that's when my family hired that person.

3  Q    Okay.  But the person that contacted you was Cheryl Sturm,

4  correct?

5  A    Yes.

6  Q    Okay, all right.  And then that's the person that your

7  family eventually hired?

8  A    Yes.

9          MS. HOBART:  Okay.  I have no further questions, Your

10  Honor.

11          THE COURT:  Any redirect?

12          MR. GREENBERG:  No, Your Honor.

13          THE COURT:  All right.  You may step down and go back

14  to counsel table.

15          MR. GREENBERG:  Your Honor, may I retrieve the

16  newspaper article?

17          THE COURT:  (No verbal response).

18          MR. GREENBERG:  Thank you.

19          THE COURT:  All right.  We have now switched

20  interpreters, and Mercedes Allongo is now interpreting.

21          INTERPRETER ALLONGO:  Yes, Your Honor.

22          THE COURT:  All right.  And, Mr. Popote, have you

23  conversed with Ms. Allongo in Spanish and understand what --

24  what she is saying to you?

25          MR. POPOTE:  Yes.

1            THE COURT:  All right.  You may -- you may so -- at

2    this point, do you rest, Mr. Greenberg?

3            MR. GREENBERG:  I do, Your Honor.  Thank you.

4            THE COURT:  All right.  So, we'll hear from witnesses

5    for the District Attorney.

6            MS. HOBART:  Thank you, Your Honor.  The Commonwealth

7    calls Jacquelin Hamer to the stand.

8            THE CLERK:  Would you please raise your right hand.

9            JACQUELIN HAMER, RESPONDENT'S WITNESS, SWORN

10           THE CLERK:  Please state your name for the record.

11           THE WITNESS:  Jacquelin Hamer.

12           THE CLERK:  Would you spell your last name, please?

13           THE WITNESS:  H-A-M-E-R.

14           THE CLERK:  Thank you.

15           THE COURT:  Speak as close to the microphone as you

16   can.

17           THE WITNESS:  Yes, sir.

18           THE CLERK:  Can you spell your first name?  I'm

19   sorry.

20           THE WITNESS:  J-A-C-Q-U-E-L-I-N.

21           MS. HOBART:  May I begin, Your Honor?

22           THE COURT:  Yes.

23                        DIRECT EXAMINATION

24   BY MS. HOBART:

25   Q    Ms. Hamer, how are you employed?

Hamer - Direct                                    18

1  A    I'm an Assistant District Attorney in Berks County.

2  Q    Okay.  And how long have you been an Assistant District

3  Attorney in Berks County?

4  A    Seventeen and a half years, since July of 2007.

5  Q    Okay.  And were you employed as an attorney prior to

6  coming to the DA's Office?

7  A    I was in a clerical position.

8  Q    In your capacity as an Assistant DA in Berks County, in

9  2015, did you become involved in a wiretap investigation

10 involving Rafael Mueses Popote, among others?

11 A    Yes.

12 Q    And how did you become involved in the investigation?

13 A    I had expressed an interest in working on wiretap cases

14 and more complex cases.  And I believe the wiretap was already

15 up, and a supervising assistant district attorney had given me

16 some orders and warrants to review.  So, I had started

17 assisting in that process.

18 Q    Okay.  Were charges filed at the time you became involved?

19 A    They had not yet been filed.

20 Q    Okay.  And were there any other ADAs that were involved in

21 this case besides you?

22 A    Attorney Jesse Leisawitz was also helping; the supervising

23 attorney was Rosa Michetti; and Mr. Kelecic was also helping.

24 Q    How many defendants were charged resulting from this

25 investigation, do you know?

1  A    I believe about 22 total.

2  Q    Okay.  And which ADAs were in charge of prosecuting those

3  22 separate defendants?

4  A    At the time the charges were filed and the warrants were

5  executed, I learned, and Mr. Kelecic learned, that we would be

6  prosecuting them in court.  And I believe I took about 11, and

7  he took the other half, approximately.

8  Q    Okay.  So, the 11 that you took, did you -- did Mr.

9  Kelecic help you with those?

10 A    When they eventually went to trial, he did help me.

11 Q    Okay.  And the 11 that Mr. Kelecic took, did you help him

12 with those 11 defendants?

13 A    I helped him at, I believe, one of the trials.  There were

14 pretrials and other matters that he was doing on his own.  But

15 when he had a jury trial that was supposed to be more than one

16 defendant, I was there to help him.

17 Q    Okay.  And who was assigned to the prosecution of Mr.

18 Popote?

19 A    Mr. Kelecic.

20 Q    Are you familiar with the names [sic] Rafael Contreras?

21 A    Yes.

22 Q    Okay.  And are you familiar with the name Juan

23 Baez-Betances?

24 A    I remember that they were involved in the case and in the

25 trial.

1  Q    Okay.  Were they also charged co-defendants?

2  A    I believe so.

3  Q    Okay.  Were they charged co-defendants that you were in

4  charge of prosecuting or Mr. Kelecic was in charge of

5  prosecuting?

6  A    They were in Mr. Kelecic's group.

7  Q    And when you discovered that Mr. Popote's case was going

8  to trial, what did you do to prepare for trial?

9  A    I think I was told, or it was suggested, that I would help

10 with the admission of the physical evidence that came about as

11 part of the search warrants.  So, the drugs and any contraband,

12 and any stipulations; and then the lab techs who are testifying

13 about the results of their analysis.

14 Q    Okay.  Were you responsible for presenting any civilian or

15 co-defendant testimony?

16 A    No.

17 Q    Okay.  Prior to trial, were you involved -- prior to Mr.

18 Popote's trial, were you involved in any discussions whether

19 Mr. Contreras or Mr. Baez-Betances would be testifying against

20 Mr. Popote?

21 A    No.

22 Q    Did you even know they were going to be testifying against

23 Mr. Popote?

24 A    I was vaguely aware, but I was not -- I was not part of

25 the full plan and the lineup.  I just really knew who my people

1  were and at what point Mr. Kelecic hoped to get to them in the

2  trial.

3  Q    Okay.  When you say your "people," you mean the witnesses

4  that --

5  A    My witnesses that I was --

6  Q    -- you were going to present?

7  A    I apologize for talking over you.  Yes, my witnesses.

8  Q    Okay, all right.  So, when was it that you found out that

9  Mr. Contreras and Mr. Baez-Betances were going to testify?  How

10 -- how much time prior to trial?

11 11:27:24

12 A    Mr. Kelecic probably mentioned it to me, and I was vaguely

13 aware that he was meeting with them, but I wasn't part of the

14 scheduling.  So, I couldn't say when exactly, but I did know

15 that they were part of his lineup of witnesses.

16 Q    Okay.  Did you meet with Mr. Contreras or Mr. Baez-

17 Betances prior to trial?

18 A    No.

19 Q    Okay.  Did you meet with counsel for Mr. Baez-Betances or

20 Mr. Contreras prior to trial?

21 A    No.

22 Q    Did you prepare either of these two co-defendants for

23 their testimony?

24 A    No.

25 Q    Okay.  Specifically, did you, in any way, extend any offer

Hamer - Direct                                    22

1   for leniency to Mr. Contreras, or Mr. Baez-Betances, or their

2   counsel in exchange for their testimony in Mr. Popote's trial?

3   A    No.

4   Q    Did you threaten or coerce either Mr. Contreras or Mr.

5   Baez-Betances into testifying?

6   A    No.

7   Q    Did you act in any way to influence the testimony of Mr.

8   Contreras or Mr. Baez-Betances before they testified at Mr.

9   Popote's trial?

10  A    No.

11  Q    Okay.  After Mr. Popote's trial was completed, did you

12  have anything to do with plea offers or agreements for Mr.

13  Contreras or Mr. Baez-Betances?

14  A    No.

15  Q    Were you present in court when Mr. Contreras or Mr. Baez-

16  Betances entered their guilty pleas?

17  A    I do not believe so, no.

18  Q    Okay.  And after trial, did you have any contact -- after

19  Mr. Popote's trial, did you have any contact with counsel for

20  Mr. Contreras or Mr. Baez-Betances related to their guilty

21  pleas?

22  A    No.

23         MS. HOBART:  I have no further questions for Ms.

24  Hamer, Your Honor.

25         THE COURT:  All right.  Cross-examine.

Kelecic - Direct                    23

1          MR. GREENBERG:  No questions.

2          THE COURT:  All right.  You may step down.

3          MS. HAMER:  Thank you.

4          MS. HOBART:  Your Honor, I do not intend to recall

5   Ms. Hamer during these proceedings.  May she be excused from

6   court?

7          THE COURT:  Yes.

8          MS. HAMER:  Thank you.

9          THE COURT:  You may be excused.

10         MS. HOBART:  Thank you, Your Honor.  My next witness

11  will be Mr. Kenneth Kelecic.

12         THE COURT:  All right.

13         MS. HOBART:  He's outside; I'll go get him.

14         THE COURT:  Okay.

15                    (Pause)

16         THE CLERK:  Would you please raise your right hand.

17      KENNETH KELECIC, RESPONDENT'S WITNESS, SWORN

18         THE CLERK:  Please state your name for the record.

19         THE WITNESS:  Kenneth Kelecic, K-E-L-E-C-I-C.

20         THE CLERK:  Okay; thank you.

21         MS. HOBART:  May I begin, Your Honor?

22         THE COURT:  Yes.

23                  DIRECT EXAMINATION

24  BY MS. HOBART:

25  Q    Mr. Kelecic, how are you employed?

1  A    I'm an Assistant District Attorney with the Berks County

2  District Attorney's Office.

3  Q    Okay.  And how long have you been employed in that

4  capacity?

5  A    Since October of 2014.

6  Q    Prior to October of 2014, how were you employed?

7  A    I was an Assistant Public Defender with Berks County.

8  Q    Okay.  And how long have you been practicing law?

9  A    Since 2006.

10 Q    Okay.  So, in 2015, when you were with the Berks County

11 District Attorney's Office, did you become involved in a

12 wiretap investigation involving Rafael Mueses Popote, among

13 other defendants?

14 A    I was.

15 Q    And how did you become involved in the investigation?

16 A    In roughly April or May of that year, I was reached out to

17 by one of the other Assistant District Attorneys who had

18 already begun an operation into some other individuals, Nelson

19 Guzman and George Meletiche.  Because of that investigation, we

20 decided we were going to go further with other individuals who

21 were involved.  And at that point, I became involved writing

22 new wiretap applications and reviewing affidavits of probable

23 cause.

24 Q    So the investigation was proceeding at the time that you

25 became involved?

Kelecic - Direct                                        25

1  A    It had -- it was in its early phases, but yes.

2  Q    And were there other Assistant District Attorneys that

3  were involved in this investigation?

4  A    The initial two ADAs who were involved in the case were

5  Rosa Michetti and Jesse Leisawitz.  But at that point, after

6  the initial wiretaps had been sought, before we knew about Mr.

7  Popote, myself and Jacquelin Hamer became assigned to continue

8  the investigation.

9  Q    Okay.  And what was Mr. Popote's involvement in the

10 investigation?

11 A    Mr. Popote was a higher level narcotics distributor.

12 Mostly cocaine, some methamphetamine.  And he had individuals

13 who worked under him, as well as individuals who he was

14 receiving narcotics from, and other buyers he had, as well.

15 Q    Was there a time that the Office decided to commence

16 criminal charges against people involved in the wiretap

17 investigation?

18 A    Yes, after we had completed, I believe, 11 wire

19 interceptions, and we had reached a point where we weren't

20 going to be able to go further up the chain than Mr. Popote's

21 supplier.  At that point, we made the decision to charge all

22 the individuals we had intercepted; I believe that was early

23 June of 2015.

24 Q    Okay.  And how many defendants were charged as a result of

25 this -- the whole wiretap investigation?

1   A    Twenty-two.

2   Q    Okay.  And you said you and ADA Hamer were working on the

3   investigation at that part -- at that point?

4   A    That's correct.

5   Q    Okay.  How did you divide the work for the prosecutions?

6   A    Well, because we had -- there were 22 people, we decided

7   to try to divide them up as evenly as we could by number.  What

8   became apparent once we looked at the entire operation is that

9   there were actually two operations that were connected by a

10  bridge.  The original Meletiche and Guzman operation, Ms. Hamer

11  handled; that was 11 defendants in total.  I took the other 11

12  defendants who were basically anyone who was supplying to

13  Nelson Guzman and George Meletiche, so above them.  So, I ended

14  up -- somehow it worked out, it was 11 and 11.

15  Q    Okay.  And where did Mr. Popote fall in that mix?

16  A    I handled the prosecution of Mr. Popote because he was a

17  supplier to an individual named Erick Nunez.  And Mr. Nunez was

18  a direct supplier to Nelson Guzman and George Meletiche.

19  Q    Okay.  So, you were responsible for the prosecution of

20  this plaintiff in this federal habeas proceeding, Rafael Mueses

21  Popote?

22  A    I was.

23  Q    So, during the investigation, did you become familiar with

24  the names Rafael Contreras and Juan Baez-Betances?

25  A    Yes.  I became familiar with them while we were still

1  listening to Mr. Popote's phone conversations, as well as still

2  seeking additional wiretaps for people up the supply chain from

3  Mr. Popote.

4  Q    Okay.  And were Rafael Contreras and Juan Baez-Betances

5  also charged with criminal charges resulting from this wiretap

6  investigation?

7  A    They were.

8  Q    And who was responsible for prosecuting these two

9  defendants?

10  A    I was.

11  Q    Okay.  Was there a time that you became aware that Mr.

12  Contreras and Mr. Baez-Betances were willing to testify against

13  Popote at trial?

14  A    Yes.

15  Q    And how --

16  A    Both individuals.

17  Q    And how did that come about?

18  A    After charges had been filed, and after the cases were

19  already up at the Court of Common Pleas level, their counsel

20  reached out to us fairly early on and informed us that they

21  would be willing to cooperate with law enforcement.  With that

22  being the case, their cases basically stayed continued while we

23  tried to figure out what the other defendants who were charged

24  were going to do.

25  Q    Okay.  Were Contreras and Baez-Betances represented by

Kelecic - Direct                                        28

1  separate defense counsel?

2  A    They were.

3  Q    Okay.  So, each of their counsel separately reached out to

4  you?

5  A    Correct.

6  Q    Okay.  Was there a time -- let's speak about Mr. Contreras

7  specifically.  Was there a time that you met with Mr. Contreras

8  about his cooperation prior to Mr. Popote's trial?

9  A    Yes, I believe that was in August of 2016.

10  Q    Okay.  And what was the purpose of that meeting?

11  Q    The purpose of that meeting was to get what we call a

12  proffer statement from Mr. Contreras, basically an explanation

13  of what his role was in the drug operation, as well as who else

14  was involved, what they did.  And I believe we even went over

15  some phone calls at that point with him and had him identify

16  voices and other actors.

17  Q    Okay.  Was Mr. Contreras represented by counsel during

18  that meeting?

19  A    He was.

20  Q    Okay.  And who else was present?

21  A    That meeting was Mr. Contreras, his attorney, Catherine

22  Nadirov, myself, Berks County Detective George Taveras, and

23  State Trooper Troy Greenawald.

24  Q    Detective Taveras and Trooper Greenawald, were they the

25  affiants in this wiretap investigation?

1  A    They were.  I also left out, they -- there was a Spanish

2  interpreter when we met with Mr. Contreras because he only

3  spoke Spanish, as well.

4  Q    Okay.  So, was there -- a proffer was made during that

5  meeting?

6  A    That's correct.

7  Q    And is the proffer written or oral?

8  A    The way that proffer was run was Detective Taveras asked

9  questions of Mr. Contreras.  During the time that the questions

10 were being asked, Trooper Greenawald was typing down questions

11 and answers.  And then at the conclusion of the interview

12 session, Mr. Contreras then reviewed the typed statement with

13 his counsel, and initialed and signed the proffer.

14 Q    Okay.  If I showed you that typed statement, would you

15 recognize it?

16 A    I would.

17         MS. HOBART:  Your Honor, I do have extra copies of

18 the exhibits that I intend to show to Mr. Kelecic.  Would you

19 like me to hand one up for you?

20         THE COURT:  Yes, please.

21                   (Pause)

22         MS. HOBART:  May I approach, Your Honor?

23         THE COURT:  Yes.  Mr. Greenberg has a copy?

24         MR. GREENBERG:  I do, Your Honor; thank you.

25         THE COURT:  All right.

Kelecic - Direct                                30

1        MS. HOBART:  Do you want an extra copy?

2        MR. GREENBERG:  Sure.

3                    (Pause)

4        MS. HOBART:  Your Honor, how would you prefer this

5   document to be marked for the record?

6        THE COURT:  Do you -- do you want to mark it D-1?

7        MS. HOBART:  D-1?  Yes, Your Honor.

8        THE COURT:  That would be fine.

9   BY MS. HOBART:

10  Q    Mr. Kelecic, there is a document in front of you which has

11  been identified by -- for the record as D-1.  Do you recognize

12  that document?

13  A    I do.

14  Q    What is it?

15  A    This is the proffer agreement -- I shouldn't -- not a

16  proffer agreement.  Proffer statement made by Rafael Contreras

17  on August the 31st of 2016.

18  Q    Okay.  And you were present when this statement was made?

19  A    I was.

20  Q    I will refer you to the last page of this statement that

21  contains signatures.

22  A    I'm looking at it.

23  Q    Okay.  And on the signature line, there is a signature

24  there which appears to say Rafael Contreras.  Do you see that?

25  A    I do.

Kelecic - Direct                                          31

1  Q    Were you present when Mr. Contreras signed that?

2  A    I was.

3  Q    And that is his signature?

4  A    That's the signature he wrote down that day.

5  Q    Okay.  If you could turn to the page immediately before

6  that, which is going to be the fourth page in that packet.

7  A    I'm looking at it.

8  Q    Were there questions asked to Mr. Contreras whether he

9  expected anything in exchange for his proffer or his proposed

10 testimony against Mr. Popote?

11 A    Yes, the last two questions deal with whether things were

12 promised to him, or anything was offered to him.

13 Q    Okay.  And you see his response was nada or nothing?

14 A    Yes.  The -- the first question was, "Have you been

15 threatened in any way or promised anything in exchange for this

16 statement?"  He said, "No."

17        The follow-up question was, "What do you believe you

18 will receive in exchange for your cooperation in this

19 investigation?"  He handwrote the words "nada," and put his

20 initials.  And then what he had said was, "I hope that I will

21 get consideration with my sentence and with my deportation.  I

22 have not been guaranteed that I will get anything."  And then

23 he, once again, wrote "nada," and placed his initials next to

24 it.

25 Q    Okay.  During the meeting, did you make any verbal

1  promises for leniency to Contreras or his counsel in exchange

2  for his testimony against Mr. Popote?

3  A    No.

4  Q    Okay.  Did you promise anything to him in exchange for his

5  testimony?

6  A    No.  The conversation we had with Mr. Contreras, because

7  it is the same conversation I have any time I conduct one of

8  these proffer agreements, is that we are not promising a

9  defendant anything in exchange for their testimony.  We

10 understand that they are looking for consideration for their

11 helping the Commonwealth, but we do not promise them anything

12 in exchange for their cooperation.  That does not get worked

13 out until after they have completed their cooperation.

14 Sometimes that's just giving us a proffer, which we use to get

15 other people to plead guilty.  Sometimes it involves testifying

16 at trial, as it did with Mr. Contreras.

17 Q    Okay.  All right, so the other person that we were

18 speaking about was Mr. Baez-Betances, who also testified

19 against Mr. Popote at trial.  So, did you meet with Mr.

20 Baez-Betances about his cooperation prior to Mr. Popote's

21 trial?

22 A    Yes, we met with Mr. Baez-Betances on September the 1st of

23 2016, the next day after we had met with Mr. Contreras.

24 Q    Okay.  And who was there for that meeting?

25 A    That would have been Mr. Baez-Betances, his attorney,

1  Daniel Emkey, myself, Trooper Greenawald, and Detective George

2  Taveras.  There was no interpreter during that meeting.

3  Q    Okay.

4  A    Mr. Baez-Betances spoke English.

5  Q    Okay.  And what was the purpose of that meeting?

6  A    The same as Mr. Contreras.  It was to get his statement on

7  record as far as his involvement in this drug operation, as

8  well as people that he knew were involved.  We also played

9  phone calls for him, had him identify the people on the phone

10 calls, and explained to us what was going on in situations

11 where Spanish was used or slang was used.

12 Q    Okay.  Were Mr. Baez-Betances's statements reduced to

13 writing?

14 A    Yes, in the same way that Mr. Contreras's were.

15 Q    Okay.  And if I showed you the statement document, would

16 you recognize it?

17 A    I would.

18       MS. HOBART:  For the record, Your Honor, I'd like to

19 mark this as D-2.

20       THE COURT:  Yes.

21       MR. GREENBERG:  I have this, as well, Your Honor.

22 A    Thank you.

23 Q    Mr. Kelecic, you have in front of you, which has been

24 marked for the record as D-2, do you recognize that document?

25 A    If I could have one second to finish going through it.

Kelecic - Direct                                    34

1   Q    Oh, sorry.

2                          (Pause)

3   A    I've completed going through it.  This is the -- I do

4   recognize this document.

5   Q    Okay.  And is this the written statement that was taken

6   from Mr. Baez-Betances at that meeting?

7   A    It was.

8   Q    Okay.  I'll refer you to the last page of that document.

9   And there is something written there by signature, which

10  appears to say "Juan A. Baez."  Do you see that?

11  A    I do, and I observed Mr. Baez-Betances that day sign this

12  document, as well as the signature below his, which is Trooper

13  Greenawald's.

14  Q    Okay.  All right.  And the page immediately before the

15  signatures.  Were there any questions on that page with respect

16  to what Mr. Baez-Betances may have been expecting for his

17  testimony?

18  A    Yes, the second to last -- there are two questions dealing

19  with that.  The first is, "Have you been threatened in any way

20  or promised anything in exchange for this statement?"  He said,

21  "No."

22          And the next question was, "What do you believe you

23  will receive in exchange for your cooperation in this

24  investigation?"  And he said, "I don't know."

25  Q    Okay.  So, during that meeting, did you have any

1  discussions with Mr. Baez-Betances or his counsel about what

2  they may expect in exchange for their testimony against Mr.

3  Popote?

4  A    We specifically informed him that we were not promising

5  him anything, and were not entering into any agreements with

6  him at that point.  Much as I said with Mr. Contreras, it's the

7  same conversation I have every time we do one of these

8  proffers, which is we are not promising you anything.  But we

9  understand that you are looking for consideration in exchange

10 for your testimony, but we're not promising you anything at

11 this time.

12 Q    Okay.  All right.  And was that the end of your meeting

13 with Mr. Baez-Betances?

14 A    These first meetings, it was.

15 Q    Yes.  Now, Mr. Popote's case went to trial in January of

16 2017, correct?

17 A    That is correct.

18 Q    Okay.  Prior to trial, did you meet with Mr. Contreras or

19 Mr. -- and Mr. Baez-Betances to prepare their testimony?

20 A    We did.  Mr. Popote's case was set to go to trial twice.

21 Between the times that we took these proffers and him actually

22 -- well, and then he actually went to trial the second time.

23 The first time was in October of 2016.  And prior to that trial

24 date, we met with Mr. Baez-Betances and Mr. Contreras.  Again,

25 basically just to prepare their testimony, because the proffer

Kelecic - Direct                                       36

1  statement is one thing, actually preparing them to testify is

2  somewhat different.

3  Q     Okay.  Did you meet with them together or separately?

4  A     Separately.

5  Q     Okay.  And were their counsel present at the time that you

6  met with each man?

7  A     Yes, we would not speak with a defendant about criminal

8  charges without their attorney being present.

9  Q     Okay.  During either of these meetings, either in

10  preparation for the October trial date or in preparation for

11  the January trial date, did you make any promises for leniency

12  or anything else to Mr. Contreras or Mr. Baez-Betances, or

13  their counsel, in exchange for their testimony against Mr.

14  Popote?

15  A     No, we did not.

16  Q     Other than the proffer, the documents that we see, and the

17  meetings for trial preparation, did you have any other meetings

18  with Mr. Contreras or Mr. Baez-Betances about testifying for

19  the Commonwealth against Mr. Popote?

20  A     No, we did not.  Mr. Contreras was incarcerated at the

21  time, so speaking with him would have been difficult.  Plus,

22  he's represented by counsel, so we would have to go through

23  counsel.

24        I believe Mr. Baez-Betances was also incarcerated at

25  that time, so we would not have spoken to him except for --

Kelecic - Direct                                          37

1   through his counsel either.

2   Q    Okay.  And did you speak to either of their counsel about

3   what the clients -- what the defendant -- co-defendants may

4   receive in exchange for their testimony?

5   A    No, we did not.

6   Q    Okay.  Did you threaten or coerce either Mr. Contreras or

7   Mr. Baez-Betances into testifying against Mr. Popote?

8   A    No, we did not.

9   Q    Did you act in any way to influence the testimony of Mr.

10  Contreras or Mr. Baez-Betances before they testified at Mr.

11  Popote's trial?

12  A    No, we did not.

13  Q    Okay.  Now, after Mr. Popote's trial was completed, both

14  Mr. Contreras and Mr. Baez-Betances entered guilty pleas,

15  correct?

16  A    That is correct.

17  Q    Okay.  Were there any other assistant DAs involved in

18  negotiating the pleas for Mr. Contreras or Mr. Baez-Betances?

19  A    No, it was -- it was myself, because Ms. Hamer was

20  handling the other portion of the operation, so she wasn't

21  really involved in making offers for any of my client -- or any

22  of my defendants I was prosecuting.

23  Q    Okay.  And let me back up for just a second.  When you met

24  with Mr. Contreras and Mr. Baez-Betances for either their

25  proffers or the two sessions of trial prep, were there any

Kelecic - Direct                              38

1  other assistant DAs that were meeting -- that were with you

2  during those meetings?

3  A    No, it was just myself, the troopers, the defendants, and

4  counsel.  The room that we meet with them in is not large, so

5  having more people in there would be uncomfortable.

6  Q    Okay.  All right.  So let's move on to the pleas.  So, for

7  Mr. Contreras, who actually formulated the plea agreement for

8  Mr. Contreras?

9  A    I did.

10 Q    Okay.  And when was this plea agreement formulated?

11 A    It would have been sometime after Mr. Popote's trial, but

12 before February 15th when Mr. Contreras pled.

13 Q    Okay.  So, you remember February 15th as a date that Mr.

14 Contreras entered his guilty plea?

15 A    That's my recollection.

16 Q    Okay.  Do you remember the date that -- or roughly the

17 date when he testified against Mr. Popote?

18 A    It would have been during his trial that ran January 30th

19 through February the 2nd.

20 Q    Okay.

21 A    I don't remember exactly which date he testified, though.

22 Q    Okay.

23 A    It was closer to the end of trial, because it was after

24 all of the phone calls had been placed into evidence, and the

25 physical evidence had been placed into testimony -- or in the -

Kelecic - Direct                          39

1  - into the record.  So, it would have been closer to the end of

2  trial.

3  Q    Okay.  So, but Mr. Contreras entered his guilty plea

4  roughly less than two weeks after Mr. Popote's trial and

5  conviction?

6  A    That is correct.

7  Q    Okay.  Why so quick?

8  A    Two reasons, really.  This matter -- the entire operation

9  which was dubbed Ice-Out, all of those cases were before the

10 Honorable Judge Paul Yatron.  Judge Yatron was not a jurist who

11 liked to let cases languish on his docket for very long.  So,

12 when we had originally asked for Mr. Contreras's case to be

13 placed for a status date after Mr. Popote's trial, Judge Yatron

14 gave us a date within two weeks of the trial.

15       And when we got to the point of that date, since we

16 had no further use for Mr. Contreras as a witness, we were

17 prepared to have his case be closed.  So, part of it was

18 pressure from the judge to get cases moving, especially because

19 we had 22 defendants, and the other half of the operation that

20 Ms. Hamer was prosecuting, not a lot of those defendants had

21 gone to trial either.  So, there were a number of defendants

22 still pending.

23       Additionally, the other reason Mr. Contreras was done

24 so quickly was at the time we were investigating this case, we

25 knew that Mr. Contreras was here illegally.  He had already

Kelecic - Direct                    40

1  been deported prior to his involvement in this case, and we

2  knew that as soon as we were able to identify him by running

3  his records.  At the time he was in Berks County Prison, he had

4  an Immigration and Customs detainer against him.  We also had

5  the firm belief that he was going to be charged as an illegal

6  reentrant.

7          So, to be honest, it comes down to dollars and cents

8  that we weren't going to pay to keep him in Berks County when

9  we knew as soon as we were done with him, he was going to be

10  transported to federal custody and be charged with federal

11  immigration crimes.

12  Q    Okay.  So, did these -- did these facts all enter into the

13  analysis when we were formulating Mr. Contreras's plea

14  agreement?

15  A    They did.

16  Q    Okay.

17          MS. HOBART:  Your Honor, I'd like to refer to a page

18  in an exhibit that was previously filed with the Court --

19          THE COURT:  Yes.

20          MS. HOBART:  -- as Document 16.

21          THE COURT:  Yes.

22          MS. HOBART:  Okay.  I'm specifically referring to

23  Page 21 of 42.

24                    (Pause)

25          THE COURT:  You may proceed.

Kelecic - Direct                    41

1          MS. HOBART:  Your Honor, I'd like to show this to the

2   witness.  May I approach?

3          THE COURT:  Yes.

4          MS. HOBART:  Thank you.

5   BY MS. HOBART:

6   Q    Mr. Kelecic?

7   A    Yes.

8   Q    I'm showing you specifically Page 21 of 42 of what has

9   previously been filed with the Court as Document 16.  Do you

10  have that in front of you?

11  A    I do.

12  Q    What is that document?

13  A    That is the -- that is the plea sheet for Rafael

14  Contreras, also known as an offer sheet in the docket where he

15  was charged with the -- under this operation.

16  Q    Okay.  And who prepared that document?

17  A    I did.

18  Q    And what is the purpose of that document?

19  A    The purpose of this document is twofold.  This is the,

20  basically, official offer that is made between our office and

21  the defendant in this case.  It is also, once we have an

22  agreement, used to alert court staff that this is the terms of

23  the plea agreement so the paperwork can be prepared.

24  Q    Okay.  Do you know when that document was prepared?

25  A    Off the top of my head, I do not.  But I know from prior

Kelecic - Direct                                                42

1  review that it was after Mr. Contreras's trial was over, but

2  before the date that -- I'm sorry, after Mr. Popote's trial,

3  but before Mr. Contreras pled guilty.  Probably only days

4  before the 15th.

5  Q    Okay.  So, there is a date that is in the lower corner of

6  that document.  What does that date represent?

7  A    That date of July 30th of 2009, that is the date that's

8  just stuck on the file, the Excel spreadsheet that we used.  I

9  believe that was the date that -- whoever in the Berks County

10 District Attorney's Office originally came up with the template

11 that we all use, that was the date it was -- it was made.

12 Q    Okay.  But that date on Page 21 of 42 has no bearing on

13 when the plea offer was extended to Mr. Contreras's counsel.

14 A    No, this date would have been eight years before the

15 operation even began that started the investigation.

16 Q    Okay.  So, the plea offer that was extended to Mr.

17 Contreras' counsel, was that within the standard range?

18 Mitigated range?  How did -- what is the standard?

19 A    So, the sentence here on possession with intent to deliver

20 cocaine based upon a sale of 10 -- between 10 and 50 grams, his

21 -- the sentence that we offered of 11 and a half to 23 months,

22 that was within the standard range.  Mr. Contreras, even though

23 he had been previously deported, had no prior record at the

24 time that this was formulated.  With the offense gravity score

25 of this crime being an eight, that made the standard range nine

Kelecic - Direct                                        43

1  to 16 months.  So, 11 and a half months is a bottom of that

2  range of his sentence, falls directly within the standard

3  range.

4          The other crime of criminal use of a communication

5  facility, we offered him five years of probation to run

6  concurrently with his sentence of 11 and a half to 23 months.

7  That is also within the standard range for that crime, which is

8  restorative sanctions to nine months.

9  Q    Okay.  And I think you testified already that the -- part

10 of the reason this particular sentence was formulated, because

11 you were aware of Mr. Contreras's immigration status.

12 A    That is correct.

13 Q    Okay.  Do you know whether or not Mr. Contreras was

14 deported after he entered his guilty plea?

15 A    I do.  In conversations I have had with the Berks County's

16 Detectives' liaison with Immigrations and Customs, an

17 individual named Ed Troy, I was informed that Mr. Contreras was

18 deported after he served a federal sentence for his illegal

19 reentry.

20 Q    Okay.  And how were you informed?

21 A    I -- when I received the initial federal habeas complaint

22 that made claims that Mr. Contreras had not been deported, I

23 was surprised that he had not been deported.  So, I looked into

24 it by contacting Mr. Troy, and I received an email back from

25 him informing me that, based upon an Immigration and Customs

Kelecic - Direct                    44

1  records review, that Mr. Contreras had, in fact, been deported.

2  Q    Okay.  And who is Mr. Troy?

3  A    He is a federal agent who is our liaison with Immigrations

4  and Customs.

5  Q    Okay.  If I showed you a copy of the email from Mr. Troy,

6  would you recognize it?

7  A    I would.

8          MS. HOBART:  Your Honor, I would like to mark this

9  for the record as Defense 3.

10          THE COURT:  Yes.

11          MS. HOBART:  Thank you.

12                    (Pause)

13  A    Thank you.

14  Q    Mr. Kelecic, do you see in front of you what has been

15  marked as Defense 3?

16  A    I do.

17  Q    And what is that?

18  A    This is a copy of both the email that I sent to Edward

19  Troy, as well as his response to it.

20  Q    Okay.  And is that the email where you said you were

21  informed that Mr. Contreras was deported?

22  A    That is correct.

23  Q    Okay.  Were you aware of whether or not Mr. Contreras was

24  prosecuted federally as an illegal reentrant?

25  A    Yes.  I -- after also receiving the initial federal habeas

Kelecic - Direct                                              45

1  complaints in this case, I ran a search myself through the

2  PACER system for Mr. Contreras to see whether or not he had

3  been actually charged with the illegal reentrant.

4          I -- at the time of the original prosecution, my

5  belief was he was going to be charged based upon conversations

6  I had -- had had with Mr. Troy, as well as the fact that there

7  had been an ICE detainer placed on Mr. Contreras while he was

8  at Berks County Prison.  But at the time of trial, I never

9  really followed up on that.

10         When I received the federal habeas complaint, I did

11 examine the record and found that he had in fact served a

12 federal sentence for the illegal reentry.

13 Q    Okay.  Did you print documents from that federal

14 prosecution file?

15 A    I did.

16 Q    Okay.  If I showed them to you, would you recognize them?

17 A    I would.

18         MS. HOBART:  Your Honor, I'd like to mark this packet

19 as D-4.

20         THE COURT:  Yes.

21         MR. GREENBERG:  Judge, I don't know if this is really

22 relevant to this particular proceeding.  I mean, whether or not

23 -- I will agree that he was federally prosecuted; I don't think

24 we need to go through all the documents.

25         MS. HOBART:  Your Honor, I'd -- even if we don't go

1   through the documents, I would like to have them marked and

2   admitted so that they're part of the record for today's

3   proceedings.

4            THE COURT:  All right.  A court docket would speak

5   for itself, so we can have them marked.

6            MS. HOBART:  Okay.

7                           (Pause)

8   BY MS. HOBART:

9   Q    And I believe you said that after Mr. Popote's trial, Juan

10  Baez-Betances also entered a guilty plea.

11  A    That is correct.

12  Q    Do you recall when that was?

13  A    Mr. Baez-Betances did not enter his guilty plea and

14  sentence until, I believe, 2019.  Because Mr. Baez-Betances --

15  not only was he going to testify against Mr. Popote, Mr.

16  Baez-Betances was also going to testify against Maico Severino-

17  Tejada, who was a supplier to Mr. Popote.

18  Q    And was Mr. Severino-Tejada also a defendant that you were

19  charged with prosecuting?

20  A    He was.

21  Q    Okay.  But eventually Mr. Baez-Betances entered a plea, as

22  well?

23  A    He did.

24  Q    Okay.  And his plea documents are included within that

25  packet that was previously filed with the Court as Document 16?

Kelecic - Direct                          47

1  A    I believe they were.  If I can have one second to verify

2  that.  Yes, I misspoke; I said 2019.  Mr. Baez-Betances entered

3  his guilty plea March 12th of 2020.

4  Q    Okay.  And his guilty plea offer, when was that formulated

5  in respect to Mr. Popote's trial?

6  A    Mr. Baez-Betances's plea sheet would not have been done

7  until after the conclusion of Mr. Severino-Tejada's case.  So,

8  probably close in time to when Mr. Baez-Betances pled.

9        Additionally, with Mr. Baez-Betances, I remember

10  there were some continuances as we got closer towards -- after

11  his cooperation against Mr. Tejada -- Severino-Tejada was

12  completed.  There was some additional time that was requested

13  by his counsel to deal with immigration matters.  Our office --

14  we don't make offers based upon immigration status.  In the

15  end, it actually turned out Mr. Baez-Betances, unknowingly, was

16  a U.S. citizen, so it never really became an issue.  But that

17  was why his plea was delayed until sometime in 2020.

18  Q    Okay.  So, Mr. Baez-Betances's immigration status did not

19  factor into the analysis in determining what to extend to him

20  as a plea offer.

21  A    It -- it did not.

22  Q    Okay.  And just to be perfectly clear, okay, you did not

23  make promises, or coerce, or threaten either Mr. Contreras or

24  Mr. Baez-Betances into testifying, or promise them anything in

25  exchange for their testimony before they testified against Mr.

Kelecic - Cross                           48

1  Popote at his trial.

2  A    To be crystal clear, no promises or threats were made

3  against either defendant.  We didn't promise them anything

4  prior to their testimony.

5          MS. HOBART:  Okay.  I have no further questions for

6  Mr. Kelecic, Your Honor.

7          THE COURT:  Cross-examine.

8          MR. GREENBERG:  Thank you.

9                   CROSS-EXAMINATION

10  BY MR. GREENBERG:

11  Q    Mr. Kelecic, was the name of this investigation Operation

12  Ice-Out?

13  A    That is correct.

14  Q    And was the lead law enforcement agent involved in this

15  prosecution State Police Officer Troy Greenawald?

16  A    Yes, Troy -- Detective Greenawald was the -- this was a

17  joint operation between the Pennsylvania State Police and the

18  Berks County Detectives.  So, there would have been a lead

19  investigator from both agencies.

20  Q    And was the one from Berks County, George Traveras [sic]?

21  A    Taveras, yes.

22  Q    Taveras.

23  A    Yes.

24  Q    Okay.

25  A    Detective Taveras was the lead from the Berks County

1  Detectives.

2  A    And the person who accompanied you or assisted you at

3  trial in playing the tapes, would that have been Trooper

4  Greenawald?

5  A    No, the -- if I remember correctly, Trooper Greenawald

6  testified as to his opinion about what the phone calls meant.

7  So we used him as an expert opinion.

8        The person who physically played the PowerPoint that

9  we used, that would have been Detective Taveras.

10 Q    Okay.  And Detective -- and Trooper Greenawald, did he

11 speak Spanish?

12 A    Trooper Greenawald does not speak Spanish.

13 Q    And yet he was the expert, you just said, about the tapes?

14 A    That is correct.  He was the expert after the phone calls

15 and tapes were translated both by Detective Taveras, as well as

16 other Spanish-speaking monitors that we use when we conduct one

17 of these operations and there are numerous Spanish-speaking

18 subjects.

19 Q    And the tapes that were translated, were they first

20 listened to by Contreras and Baez-Betances?

21 A    During our preparation set -- actually during the initial

22 proffer that both gentlemen gave, some of their phone calls

23 were -- that they were on were played for both of them.  They

24 were then asked to identify the people who were on the calls.

25 And then during the preparation sessions for trial, any phone

1  calls that I was going to play during trial were played for

2  them just to make sure that they could identify who they were.

3  And if there had been anything where they couldn't identify

4  someone, a report of that was made and turned over to defense

5  counsel.

6  Q    And were those tapes in Spanish originally?

7  A    The tapes -- yes and no.  Some of them were in Spanish,

8  some of them were in English.  Even within the same phone call

9  at times, the participants would flip back and forth between

10 Spanish and English.  Even your client, who mostly spoke

11 Spanish, every now and then would use a couple words in English

12 here and there.  But with his calls, they were mostly in

13 Spanish.

14 Q    Okay.

15 A    Baez-Betances, a little bit more English was contained in

16 his calls.

17 Q    So, let's talk about Mr. Popote.  So, with respect -- with

18 the exception of a couple of words, the tapes that were

19 associated with Mr. Popote were in Spanish?

20 A    For the most part, yes.

21 Q    And you said that Mr. Betances -- Baez-Betances and the

22 other witness, which would have been Mr. Contreras, they were

23 used to identify the speakers on the tapes.

24 A    Correct.

25 Q    They were asked to identify code words on the tapes that

1 were then associated with cocaine or other controlled substance

2 terms, is that right?

3 A    That's correct.

4 Q    They were also used to identify other code words, whether

5 they'd be referring to money or other items, is that right?

6 A    Correct.

7 Q    And you would agree with me that in your prosecution of

8 Mr. Popote, the proffers and testimony of Mr. Contreras and Mr.

9 Baez-Betances were critical, would you agree with that?

10 A    I would agree that they were -- they were helpful in

11 verifying what the law enforcement officers already believed

12 that the phone calls meant.

13 Q    Well, let's explore that for a second.  You just told us

14 that Trooper Greenawald didn't speak Spanish.

15 A    That is correct.

16 Q    So --

17          MS. HOBART:  Your Honor, I'm going to object to this

18 line of questioning.  I'm not entirely sure how it's relevant

19 to the issues that are raised in the federal habeas petition.

20          THE COURT:  Overruled.

21          MR. GREENBERG:  I'd be happy to tell you.

22          THE COURT:  Overruled.

23          MR. GREENBERG:  Thank you.

24 A    No, Trooper Greenawald does not speak Spanish.

25 Q    And so, therefore, at least with respect to Trooper

Kelecic - Cross                                    52

1  Greenawald, he was dependent upon the information, the

2  translations of the tapes, the code words used in the tapes

3  that were assisted with by Mr. Contreras and Mr. Baez-Betances.

4  Would you agree with that?

5  A    To a point, yes.  But prior to us ever speaking with

6  Contreras or Baez-Betances, the entirety of the phone calls had

7  already been translated by other members of law enforcement.

8  Any time there was a Spanish-speaking individual who made a

9  phone call during this operation, we had a bilingual police

10 officer acting as the monitor for those phone calls.  The

11 monitor is the person who listens to them as they're being made

12 in real time.

13         Once those phone calls were marked as being

14 suspicious, or being involved in some narcotics activity, they

15 were then forwarded to Detective Taveras, who is also

16 bilingual.  Detective Taveras would then listen to them, and

17 based upon his expertise in being involved in the drug culture,

18 which is something that was testified to during trial, he would

19 then converse with Trooper Greenawald.  Together, the two of

20 them would make an opinion as to whether or not the phone call

21 involved was in relation to narcotics sales.

22 Q    But the point is, is that, but for these bilingual law

23 enforcement officers, and but for the Spanish-speaking

24 cooperating defendants, Trooper Greenawald was basically in the

25 dark as to the content and the meaning of these Spanish

Kelecic - Cross                          53

1  conversations.  Would you agree with that?

2  A    In that Trooper Greenawald doesn't speak Spanish, yes.

3  Q    In that Trooper Greenawald doesn't speak Spanish.

4  A    Yes, I would agree with you that unless he was told what

5  these things said, he would not have been able to formulate an

6  opinion.

7  Q    That's exactly right.  And that's why Contreras and

8  Baez-Betances were essential in the prosecution of Mr. Popote.

9  A    Even without those two individuals coming in, we still

10 would have proceeded to trial without them.

11 Q    I'm not saying that you wouldn't have proceeded to trial

12 without them, but you had the good fortune of having them in

13 testifying against Mr. Popote.  Would you agree with that?

14 A    I would agree with that.

15 Q    Okay.  Now, let's talk about your personal experience as a

16 public defender and as a prosecutor.  Did you tell us that you

17 were a public defender as of 2006?

18 A    No, I joined the -- I started practicing law in 2006.

19 Q    And when did you join the Public Defender's Office?

20 A    2008.

21 Q    2008.  So, between 2008 and 2014, you worked as a public

22 defender of the Berks County's Office?

23 A    I did.

24 Q    And during that six-year period of time, between 2008 and

25 2014, did you negotiate plea agreements and cooperation

1  agreements on behalf of your clients with the Berks County

2  Prosecutor's Office?

3  A    I am sure I did.

4  Q    You probably negotiated thousands of them.  Would you

5  agree with that?

6  A    Yes.

7  Q    And you knew, as your former status as a public defender,

8  the protocol that was engaged in between defense counsel and

9  the Prosecutor's Office in connection with how plea agreements

10 are formulated and how ultimately they are finalized.  Would

11 you agree with that?

12 A    Can you repeat the question?  I'm not -- I mean, do I

13 understand the plea -- how these things -- how plea offers come

14 about?

15 Q    Correct.

16 A    Then, yes.

17 Q    Okay.

18 A    Yes.

19 Q    And you know that with the experience and the passage of

20 time of six years, how plea agreements are developed and how

21 ultimately they are implemented.  Would you agree with that?

22 A    Yes.

23 Q    So, in your experience, you don't have to have a explicit

24 word-for-word statement as to what your defense client is going

25 to receive to have a good idea as to what he ultimately will

Kelecic - Cross                                55

1  receive when he pleads guilty and is sentenced.  Would you

2  agree with that?

3  A    I mean, I have the guidelines, and I know what they're

4  charged with.  If that's what you mean, then yes.

5  Q    In part, yes.

6  A    I mean, I have -- yes, I would agree that I have a rough

7  idea before I've ever even received an offer --

8  Q    Sure.  And you --

9  A    -- what a defendant is looking at.

10  Q    And you also know that one of the benefits of cooperating

11  plea agreements is that a defendant gets to plead guilty to

12  just some of the charges and not all of the charges.  Would you

13  agree with that?

14  A    I would agree that the -- 99 percent of the time when a

15  defendant is going to cooperate with the Commonwealth that they

16  are hoping they are going to get a much better agreement than

17  if they had not.

18  Q    That's not my question.  Of course they hope to, but

19  that's the subjective intent.  What I'm talking about is your

20  experience as a defense lawyer knowing that when your client

21  testified on behalf of the Commonwealth, it was understood

22  implicitly that some of the charges that your client was

23  charged with would be dropped at the time he pled guilty and

24  was sentenced.  Isn't that correct?

25  A    First of all, the -- any time anyone pleads guilty in

1  Berks County, they never plead to the entire information unless

2  they're pleading open.  It's always to a number of counts.  So,

3  the dropping of counts, I don't think is a fair way to

4  summarize that.

5  Q    Well, but the fact of the matter is, is that when somebody

6  pleads guilty and cooperates, you've just said in Berks County,

7  some of the charges are dropped, right?

8  A    Correct.

9  Q    Okay.  Now, because that is an implicit understanding

10  between a defense lawyer and a prosecutor, that doesn't have to

11  be made explicit in a plea agreement with the defendant, does

12  it?

13  A    I -- I think it does.  Because I can tell you, I have both

14  been on the defense side and been unhappy with what a client

15  was eventually offered after cooperation, and I have made

16  defendants unhappy when they are -- after they've cooperated

17  since I've been a DA.

18  Q    Well, you said that 99 percent of cases in Berks County

19  that end in plea agreements or end in guilty pleas have charges

20  dropped.  You did testify to that.

21  A    Correct.

22  Q    Okay.

23  A    We don't make -- we don't make people plead to all of the

24  counts in an information.

25  Q    Correct.  And in our case -- in our case, with respect to

Kelecic - Cross                                        57

1 Mr. Contreras, there were a number of charges that were

2 dropped, weren't there?

3 A    There were.  I can't tell you I know how many he was

4 charged with, but I know just from looking at the plea sheet

5 that he pled to Counts 10 and 17.

6 Q    Okay.

7 A    And I'm assuming there were substantially more than that

8 based upon his participation in this case.

9 Q    Take a look at Page 20 of Document Number 16.

10 A    Okay.

11       MR. GREENBERG:  Does the Court have that?

12       THE COURT:  Yes.

13 A    I see dismissal of lesser charges.  It looks like there

14 were additionally -- in total, there were 41 charges against

15 Mr. Contreras.

16 Q    And how many charges did Mr. Contreras, of those 41, plead

17 guilty to?

18 A    Two.

19 Q    Okay.  So, 39 charges were dropped as a benefit to Mr.

20 Contreras, right?

21 A    Partially as a benefit to Mr. Contreras, and partially

22 because 41 counts is a lot of paperwork that we typically don't

23 heap upon the Court.  In almost all of the pleas we do in Berks

24 County, a defendant will plead to only a few counts even --

25 whether they've cooperated or not, simply because if you can

Kelecic - Cross                                              58

1  get an agreeable amount of time between the Commonwealth and

2  the defendant, there's no need to have them plead to all of

3  those counts.

4  Q    And that's the point, Mr. Kelecic.  The point I'm trying

5  to make is, and I want you to agree with it or not, is that

6  when you have a cooperating agreement with somebody, and you're

7  working with the lawyer of that individual -- in Mr.

8  Contreras's situation, that would have been Ms. Nadirov, you

9  both understand that there's going to be a significant number

10 of charges that are dropped.  Isn't that right?

11 A    Correct.

12 Q    And that is implicit in any understanding that you have

13 with the defendant and that defendant's lawyer that does not

14 have to be memorialized in a proffer statement, does it?

15 A    In Berks County, it would be implicit that, whether he has

16 cooperated or not, at the time of a plea agreement, a number of

17 counts will be dropped.  For example, Mr. Popote was made

18 offers to only a couple of counts.  And if I had to guess, it

19 would probably be an offer to probably four or five counts,

20 because that's what fits on the one-page plea agreement.

21 Q    Okay.  But what I -- you would agree with me then that

22 simply because certain considerations are not memorialized on a

23 proffer statement, that doesn't mean that there's not an

24 understanding between you and the defense lawyer as to what the

25 charges or what benefit his client or her client is going to

Kelecic - Cross                                              59

1  get.

2  A     The -- I wouldn't agree with you on that.

3  Q     You would not.

4  A     Because the -- the number of counts that a person is going

5  to agree to, to plead guilty, at least in our county, it

6  happens in every case that, where there is a large number of

7  counts, that an individual does not plead to all of them.

8        The issue that is not decided when we have one of

9  these charge agreement -- or we have one of these proffer

10 agreements is, there's no conversation about time.  There's no

11 conversation about sentences.  And that's the point where we

12 don't make any agreements.  We don't make any promises.  We

13 don't tell them, hey, if you plead guilty, if you help us out,

14 we'll give you less than a year.  That's the conversation that

15 does not happen.  It's not agreed to by the parties.  And I

16 don't think the defense counsel know exactly what they're

17 looking at.  Because, as I just said, I can tell you, I've had

18 cases where, after people have come in and proffered, they end

19 up testifying, not testifying, I make an offer and their

20 counsels [sic] comes back to me and says, well, my

21 clients [sic] doesn't find this to be agreeable, and hey, he

22 helped you out.

23       So, I don't -- I don't agree that there is an

24 implicit anything, other than maybe than dropping of counts,

25 but that's implicit in every plea in our County.

Kelecic - Cross                          60

1  Q    Well, if you're so concerned about administrative

2  cleanliness, and not wasting paper by having somebody plead to

3  all the counts that were filed, why would you even have to file

4  the charges -- all those counts to begin with?

5  A    Because the facts support all of those charges being

6  filed.

7  Q    And, therefore, since the facts support all those charges

8  being filed, it is really helpful when those charges are

9  dismissed as part of a plea agreement.  Would you agree with

10 that?

11 A    I would agree that less charges is helpful for a

12 defendant.

13 Q    Thank you.  And in our case, since -- with respect to Mr.

14 Contreras, since 39 counts were dismissed, he saved himself an

15 enormous amount of time, potentially, that he could have been

16 sentenced to by Judge Yatron.  Would you agree with that?

17 A    That is correct.

18 Q    And --

19 A    He saved himself time.

20 Q    And ultimately, the sentence that Mr. Contreras got was

21 time in served.  Would you agree with that?

22 A    Yes, because he was given credit for 621 days.

23 Q    That is correct, because he was entitled to that credit,

24 was he not?

25 A    Yes.  He had been in -- Mr. Contreras had been arrested

Kelecic - Cross                               61

1  the day we served searched warrants, and stayed incarcerated

2  until he pled guilty.

3  Q    Okay.

4  A    And then was in federal custody after that.

5  Q    Right.  Now, with respect to Mr. Baez-Betances, Mr.

6  Greenberg also received a sentence of time in served, is that

7  right?

8  A    That is correct.

9  Q    All right.  And Mr. Baez-Betances, if you look at Page 39

10 of 42, for the charges he pled guilty to, he was facing 47

11 years in jail, wasn't he?

12 A    That is correct.

13 Q    And a $65,000 fine.

14 A    That's correct.

15 Q    And he got what, again?

16 A    He got --

17 Q    Time in served.

18 A    Give me one second, I'll take the exact sentence.

19 Q    Sure.

20 A    He received 182 days to 364 days at Count 1, with credit

21 of 364 days time served.

22       At the other counts, he received five years of

23 probation, that ran consecutive to the jail sentence but

24 concurrent with each other, for a total of 10 years of

25 probation.

Kelecic - Cross                                          62

1  Q    Okay.  So, he got basically a time in served.

2  A    He got time served followed by 10 years of probation.

3  Q    Yes.  Now turn to Page 32 of this document, please.

4  A    Yes.

5  Q    Line 10.

6  A    Um-hum.

7  Q    Mr. Baez-Betances, after he was sentenced, said to the

8  Court, "I just want to thank Ken for coming, you know, for

9  giving me this opportunity, for understanding, you know, as it

10 has been almost five years."  Did I read that passage

11 correctly?

12 A    You read that from the transcript correctly.

13 Q    Who is Ken?

14 A    I believe he would be talking about me.

15 Q    Do you know why he would be on first name basis with you,

16 Mr. Kelecic?

17 A    I don't know why he'd be really on first name basis with

18 me.  I can tell you Mr. Baez-Betances, in conversations I had

19 with him leading up to his entry of his plea, was thankful that

20 we allowed him to -- we didn't push the plea faster because he

21 was trying to resolve whatever that immigration issue was, as

22 well as his cooperation with the other matter, with Mr.

23 Severino-Tejada, and what was going on with that case.

24 Q    Okay.  So, whatever it was that motivated him to speak to

25 you or speak to the Court about you on a first name basis --

Kelecic - Cross                    63

1    A    He did use my first name.

2    Q    -- he did use your first name.  Now, did you have prior

3    dealings with Mr. -- with Ms. Nadirov, who was the lawyer for

4    Mr. Contreras, or Mr. Emkey, who was the lawyer for Mr. Baez-

5    Betances?  Had you ever dealt with them before in your capacity

6    as a prosecutor?

7    A    If I did, not many, because I didn't join the DA's Office

8    until October of '14.  And when I was initially assigned to the

9    District Attorney's Office, I was placed in the Appeals

10   Department, because I could have potentially had conflicts

11   based upon my prior employment as a public defender.

12          So, the only time I would have had interaction with

13   either of them at that point would have been preliminary

14   hearings on unrelated matters.  I think I handled a couple

15   other large cases before that, but I didn't -- I don't remember

16   them being involved.  The reason I have a little bit of trouble

17   remembering that is because I knew both of them when I was a

18   public defender.

19   Q    Okay.  And how did you know both of them?  In your

20   capacity as defense lawyers, the three of you?

21   A    Mr. Emkey, yes.  Ms. Nadirov was actually previously an

22   Assistant District Attorney before she went to private

23   practice, so I knew her in that capacity.  But just

24   colloquially, like, I knew them socially.

25   Q    Okay.  Well, but you also knew them professionally insofar

1 as you dealt with Ms. Nadirov in her capacity as an ADA, and

2 you in a capacity as an assistant public defender.

3 A    Correct.

4 Q    And you dealt with Mr. Emkey as comrades in defense

5 attorney arms --

6 A    Yes.

7 Q    -- would you agree with that?  Okay.

8 A    Yes, I would agree with that.

9 Q    All right.

10         MR. GREENBERG:  Judge, I think that's all I have.

11 Oh, just one -- just one second.

12                    (Pause)

13         MR. GREENBERG:  Just a couple more things.

14 BY MR. GREENBERG:

15 Q    The Commonwealth Exhibits marked as D-1 and D-2, were

16 these disclosed to Mr. Contreras's defense counsel prior to

17 trial?

18 A    Yes, they were part of the discovery packet that we put

19 together.

20 Q    Okay.  And did you disclose to defense counsel prior to

21 trial the status of Mr. Contreras's immigration and federal

22 prosecution status?

23 A    Yes.

24 Q    Okay.

25 A    They -- the fact that they were -- that Mr. Contreras was

Kelecic - Redirect                    65

1  -- had an ICE detainer was part of our file, so we would have

2  turned that over.

3          MR. GREENBERG:  Excellent.  Okay.  That's all I have;

4  thank you.

5          THE COURT:  Any redirect?

6          MS. HOBART:  Just very few questions, Your Honor.

7          THE COURT:  Yes.

8                      REDIRECT EXAMINATION

9  BY MS. HOBART:

10 Q    Mr. Kelecic, I did want to clarify, one of the affiants in

11 Mr. Popote's prosecution was Berks County Detective George

12 Taveras, correct?

13 A    That's correct.

14 Q    Okay.  And George Taveras is Spanish-speaking?

15 A    He is fluent in both Spanish and English.

16 Q    Okay.  Do you happen to know whether Spanish is Mr.

17 Taveras's first language?

18 A    Actually, I do, and it is his first language.  He was --

19 he was either born in Puerto Rico or the Dominican Republic.  I

20 know he grew up speaking Spanish.  He actually learned English

21 when he -- when he moved to America, and it was after he was

22 already in elementary school that he learned Spanish [sic].

23 I've conducted a number of these operations with Detective

24 Taveras, so I'm kind of familiar with his background.

25 Q    Okay.  Is there any reason for you to question his

Kelecic - Redirect                                          66

1   Spanish-speaking ability?

2   A    No.

3   Q    Okay.  All right.  And I believe one of the other things

4   you testified on -- on direct, and I do want to clarify for the

5   record, is that in Berks County, when a guilty plea offer is

6   extended to any defendant, regardless of whether they

7   cooperated or not, the guilty plea offer is not for all of the

8   charges listed on the information, correct?

9   A    In 99 percent of cases, that is correct.  I mean, assuming

10  it's not a one- or two-count information, then it might be to

11  all counts.   But when you're talking about these cases where

12  you have 30, 40 counts, or higher, in those cases, it's

13  normally to a select few charges that the person pleads guilty.

14  Q    Okay.

15           MS. HOBART:  I have no further questions, Your Honor.

16           THE COURT:  I just have a few questions.

17           THE WITNESS:  Yes, sir.

18           THE COURT:  It would be well-known in Berks County

19  that charges are dropped?

20           THE WITNESS:  It would be well-known in Berks County

21  that charges are dropped.  Off the top of my head, I can't

22  think of a case where a person came in and entered a guilty

23  plea without -- I can't think of a case where someone has pled

24  to everything in one of these large informations.

25           THE COURT:  All right.  And in your experience, a

Kelecic - Court                    67

1  defendant who was cooperating would know that charges would be

2  dropped, correct?

3          THE WITNESS:  I assume their attorneys are telling

4  them that, but that's an assumption.  I can't say for certain.

5  I know when I was a defense attorney, I would typically give

6  them that advice, but not as far as a sentence or anything like

7  that.

8          THE COURT:  All right.

9          THE WITNESS:  The number of charges, yes.  I would

10 agree that that's typically well-known that you don't plead to

11 everything.

12         THE COURT:  All right.  But a defendant may not know

13 the exact terms of the plea agreement, but he would know

14 something would be done for him with respect to sentencing, is

15 that correct?

16         THE WITNESS:  I think that's what they're hoping for.

17 I don't know that they know that for certain, though.

18         THE COURT:  But --

19         THE WITNESS:  I mean, I would think -- when I was a

20 defense attorney, I would think that, but I -- you don't know

21 that for certain.

22         THE COURT:  And that would be based upon this policy

23 you're talking about in the Berks County DA's Office.

24         THE WITNESS:  Correct, that we don't promise anything

25 ahead of time.  We tell them -- we -- we specifically tell them

Kelecic - Redirect                                              68

1  we're not promising them anything.  We're not agreeing to

2  anything in exchange for their cooperation.

3            THE COURT:  At that time.

4            THE WITNESS:  Correct.  At -- at -- we tell them

5  we're not agreeing with them for anything.

6            And like I said during my examination, there have

7  been times where defendants have been unhappy with even what

8  they get after cooperation.  But, yeah, we tell them there's no

9  agreements with them at that -- at -- yes, I agree, at that

10 moment in time.

11           THE COURT:  All right.  I heard you testify that

12 there's no agreement with them at that point, and nothing is

13 promised at that time.  Wouldn't that lead to an expectation

14 that something would be done in the future?

15           THE WITNESS:  It -- it may.  I -- I couldn't say for

16 certain that on -- for these defendants, whether that was the

17 case or not.

18           THE COURT:  All right.  I have no further questions.

19 Any questions based upon my questions?

20           MS. HOBART:  I do, Your Honor.

21                 FURTHER REDIRECT EXAMINATION

22 BY MS. HOBART:

23 Q   Mr. Kelecic, just to clarify, okay, so if a plea offer is

24 extended in Berks County, the plea offers are usually not for

25 all of the counts on the information, correct?

Kelecic - Redirect                                                69

1  A     That is correct.

2  Q     Okay.  So, if a defendant is cooperating, okay, and they

3  intend to plead guilty at some point in the future, is there

4  anything said about what charges are going to be dropped in

5  exchange for their agreement?

6  A     No.

7  Q     Okay.  Is there anything said about what sentence they can

8  expect to receive when they enter their guilty plea at some

9  point in the future?

10 A     No.

11 Q     So, the only expectation that could be had by any

12 defendant who offers cooperation is that at some point in the

13 future, if they enter a guilty plea, that some unknown charges,

14 unidentified charges are going to be dropped from the

15 information?

16 A     I would agree with that.

17 Q     And that would be the same for any defendant, regardless

18 of whether they're cooperating with the Commonwealth or not.

19 If they enter a guilty plea, they may have an expectation that

20 some unknown, unidentified charges against them are going to be

21 dropped for their guilty plea.

22 A     Yes.

23        MS. HOBART:  Okay.  I have no further questions, Your

24 Honor.

25        THE COURT:  Mr. Greenberg?

1                    FURTHER RECROSS-EXAMINATION

2  BY MR. GREENBERG:

3  Q     But because they're cooperating, the Commonwealth is going

4  to be more open to dropping more charges than someone who

5  pleads open, isn't that correct?

6  A     I'm going to say -- I'm -- no.  Because regardless of

7  whether someone cooperates or not, the offer is never to the

8  entire information.  We're going to offer lesser charges

9  regardless.  Now, what those charges are may change based upon

10 their cooperation, but the fact that charges are being dropped

11 is not something that gets considered.

12 Q     Can you repeat what you just said about the difference

13 between pleading open and pleading with cooperation with regard

14 to the nature of the charges that are dropped?  Would you just

15 it say again?

16 A     What I said was, if there is cooperation, which charges a

17 defendant pleads guilty to may be different than someone who

18 has simply come in and said, I want to plead open.

19 Q     And the nature of the charges affects the amount of time

20 that the defendant is facing or that the person is facing.

21 Would you agree with that?

22 A     For the most part, yes.

23 Q     Yes; thank you.

24            MR. GREENBERG:  That's all I have.

25            THE COURT:  All right.  Anything further?

Kelecic - Redirect                                        71

1            MS. HOBART:  I do, Your Honor, and I just want to

2    clarify something that Mr. Greenberg said.

3                    FURTHER REDIRECT EXAMINATION

4    BY MS. HOBART:

5    Q    Mr. Greenberg was talking about a defendant coming in and

6    pleading open.  Okay, so when someone comes in and pleads open,

7    they plead open to all of the counts on the information,

8    correct?

9    A    I guess I should clarify that.  There's -- typically in

10   Berks County, we have three types of pleas:  There would be an

11   entirely open plea, meaning you're pleading to everything on

12   the information.  That doesn't merge for sentencing purposes.

13           There is a charge agreement, which is we don't have a

14   set sentence in mind.  Or we have not -- I shouldn't say not in

15   mind.  We haven't agreed to a particular sentence, but we have

16   agreed to a particular set of charges that a person will plead

17   guilty to.

18           And then there is a full guilty plea agreement, which

19   is a defendant is pleading guilty to certain charges, as well

20   as an agreed upon sentence.

21           The individuals in this case, we've been using the

22   term "open."  We probably should be using the term there was a

23   charge agreement with no set sentence.  Because these -- or

24   that is -- let me back up.  These guys in this case had full

25   plea agreements.  A person who were to plead open, typically

1  they're pleading to a charge agreement, which means a number of

2  counts that have been agreed upon between their attorney and

3  the Commonwealth.  Not every count on the information.

4  Q    Okay.  So, let me just follow-up with that.  With Mr.

5  Contreras or Mr. Baez-Betances, were either one of them

6  extended a charge agreement or a negotiated plea agreement

7  prior to their testimony against Mr. Popote at trial.

8  A    No, there were no agreements.  No plea sheets made with

9  either of them ahead of time.

10 Q    Okay.  There was no discussion about what counts they

11 would plead to; no discussion about what sentence would be

12 expected in exchange for their testimony?

13 A    No.

14         MS. HOBART:  Okay.  I have nothing further, Your

15 Honor.

16         THE COURT:  Anything further, Mr. Greenberg?

17         MR. GREENBERG:  No, Your Honor.

18         THE COURT:  All right.  You may step down.

19         MR. KELECIC:  Thank you, Your Honor.

20         MS. HOBART:  Your Honor, the Commonwealth has marked

21 exhibits D-1 through D-4 through today's proceedings.  The

22 Commonwealth would like to move them into the record.  And how

23 would you like me to include them within the record kept in the

24 Clerk's Office?

25         THE COURT:  Well, you don't have to file them of

73

1  record.

2          MS. HOBART:  Okay.

3          THE COURT:  Any objection to their admission?

4          MR. GREENBERG:  No objection, Your Honor.

5          THE COURT:  All right.  D-1 to D-4 will be admitted

6  in evidence.

7      (Respondent's Exhibits D-1 through D-4 in evidence)

8          THE COURT:  And also, there was a reference to --

9  there's been other exhibits that have been marked or submitted,

10  D-14 -- I'm sorry, Exhibit 14, Exhibit 16.  But I assume that

11  whatever is attached to the Document 16 is in evidence, all

12  those?

13          MS. HOBART:  Your Honor, if it hasn't actually been

14  moved into evidence, I would like to move it into evidence at

15  this time.  I know it's been marked as a document and admitted

16  into the certified record.

17          THE COURT:  Everything in D-16 could be received in

18  evidence.

19          And obviously the transcripts speak for themselves,

20  and that's always a part of the process of decision-making in

21  these kinds of cases of what happened at the trial; what the

22  testimony was of these two witnesses.  All right, so all the

23  exhibits are in evidence.

24              (Petitioner's Exhibit 14 in evidence)

25              (Respondent's Exhibit D-16 in evidence)

1          THE COURT:  Is there any rebuttal evidence?

2          MR. GREENBERG:  No rebuttal, Your Honor.

3          THE COURT:  All right, so the evidence is closed.

4  All right, I have to make a decision.  Obviously, I can't make

5  a decision on the motion today; it's an impossibility.  I'd

6  like to study the -- get the record of the testimony and study

7  the documents in more detail.

8          But I would give the parties the opportunity to

9  submit findings of fact and conclusions of law on the issues

10  here.  I think there's two issues, if I'm not mistaken.  And

11  one is the statute of limitations issue and the other one is

12  the Brady/Giglio issue.

13          So, why don't you order the transcripts and submit

14  supplemental memoranda.  I don't think I need one side to

15  submit a memorandum, and then a response, and then a reply.  I

16  think you can file them simultaneously.  All right?

17          MS. HOBART:  I would agree, Your Honor.

18          THE COURT:  I think we can do that.  If you go

19  downstairs to the Clerk's Office after this hearing and order

20  the transcripts, you both can figure out a date that you would

21  get the transcripts, and I'll let you make an agreement on what

22  day you receive them.  And then why don't you take 30 days to

23  submit a memorandum of law from that date, all right?

24          So, I'll just enter an order, the parties are granted

25  leave to file findings of fact and conclusions of law within 30

1  days of receipt of the transcript.  And, you know, you agree on

2  the date you received it, okay?  I think that would be

3  acceptable to me.

4        All right, is there anything else that anyone wants

5  to say or do at this point?

6        MS. HOBART:  No, your record [sic] -- no, Your Honor.

7        MR. GREENBERG:  No, Your Honor.

8        THE COURT:  All right, then we'll stand in recess.

9        MR. GREENBERG:  Thank you, Your Honor.

10       MS. HOBART:  Thank you, Your Honor.

11       THE CLERK:  All rise.

12     (Whereupon, at 12:46 p.m., the hearing was adjourned.)

13

14

15                 CERTIFICATE OF TRANSCRIBER

16

17    I, KAREN HARTMANN, a certified Electronic Court

18  Transcriber, certify that the foregoing is a correct transcript

19  from the electronic sound recording of the proceedings in the

20  above-entitled matter.

21

22    /s/ *Karen Hartmann*

23  Karen Hartmann, AAERT CET 475  Date: February 20, 2025

24  TRANSCRIPTS PLUS, INC.

25