IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAFAEL MUESES POPOTE,

                    Petitioner,

     v.

LEE ESTOCK, et al.,

                    Respondents.

CIVIL ACTION
NO. 22-4773

## OPINION

**Slomsky, J.**                                                        **May 27, 2025**

### TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................................ 3

II.  BACKGROUND ................................................................................................................. 6

   A.   **Petitioner's State Trial** ............................................................................................... 6

      1.  Rafael Contreras's Testimony .................................................................................. 8

      2.  Juan Baez-Betances's Testimony ............................................................................ 10

      3.  Trooper Troy Greenawald's Testimony .................................................................. 12

   B.   **Post-Trial Procedural History** ................................................................................. 12

   C.   **Evidentiary Hearing** ................................................................................................ 14

      1.  Petitioner's Testimony ............................................................................................ 14

      2.  Assistant District Attorney Jacquelin Hamer's Testimony .................................... 16

      3.  Assistant District Attorney Kenneth Kelecic's Testimony .................................... 17

   D.   **Subsequent Procedural History** .............................................................................. 23

III. STANDARD OF REVIEW ............................................................................................... 23

**A.**    **Review of a Magistrate Report and Recommendation**................................................... 23

**B.**    **Merits Review of a Petition for a Writ of Habeas Corpus** ........................................... 24

**C.**    **Timeliness and Exhaustion**........................................................................................... 26

**IV.**    **ANALYSIS** ............................................................................................................................. 26

**A.**    **Petitioner's State Conviction Was Obtained in Violation of <u>Brady</u> and <u>Giglio</u>** ........ 26

1.    Respondents Had Understandings of Leniency with Contreras and Baez-Betances ...... 28

2.    Evidence of the Understandings of Leniency Was Suppressed........................................ 34

3.    Evidence of the Understandings of Leniency Is Favorable to the Defense..................... 36

4.    Evidence of the Understandings of Leniency Is Material .............................................. 37

**B.**    **Petition Is Timely Under 28 U.S.C. § 2244(d)(1)(D)** ................................................... 40

1.    Petitioner's <u>Brady</u> and <u>Giglio</u> Claim Concerning Contreras's Guilty Plea is Timely ..... 40

2.    Petitioner's <u>Brady</u> and <u>Giglio</u> Claim Concerning Baez-Betances's Guilty
    Plea is Timely .............................................................................................................. 46

**C.**    **Petitioner Satisfied the Exhaustion Requirement** ......................................................... 47

1.    Petitioner Failed to Exhaust the <u>Brady</u> and <u>Giglio</u> Claim in State Court........................ 48

2.    Petitioner's <u>Brady</u> and <u>Giglio</u> Claim is Procedurally Defaulted in State Court ............. 48

3.    Petitioner Demonstrated Cause for the Default and Actual Prejudice as a Result
    of the <u>Brady</u> and <u>Giglio</u> Violation ................................................................................. 52

**V.**    **CONCLUSION** ....................................................................................................................... 54

## I.     INTRODUCTION

Before the Court is a counseled Petition for a Writ of Habeas Corpus (the "Petition") under

28 U.S.C. § 2254 filed by Petitioner Rafael Mueses Popote ("Petitioner" or "Popote") against

Respondents the District Attorney of Berks County, Pennsylvania, the Superintendent of State

Correctional Institution Pine Grove, and the Attorney General of Pennsylvania (collectively,

"Respondents").[1]  (Doc. No. 1.)  On July 10, 2023, a United States Magistrate Judge issued a

Report and Recommendation ("R&R"), recommending that the Petition be denied as untimely and

that a certificate of appealability not be issued.  (See Doc. No. 9 at 1.)  On July 23, 2023, Petitioner

filed Objections to the R&R.  (Doc. No. 10.)  A district court judge must determine de novo any

proposed finding or recommendation of the magistrate judge to which objection is made.  See 28

U.S.C. § 636(b)(1)(C).  The judge may accept, reject, or modify a proposed finding or

recommendation.  Id.

In June 2015, the Berks County District Attorney's Office ("Berks County DA") filed

charges against Petitioner for his role in a narcotics distribution organization.  (Doc. No. 5 at 1.)

In February 2017, a jury found Petitioner guilty of all charges and he was sentenced to a term of

26 years' to 55 years' imprisonment, followed by 22 years' probation.  (Id.)  At trial, Rafael

Contreras ("Contreras") and Juan Baez-Betances ("Baez-Betances"), two co-conspirators in the

same narcotics distribution organization, testified against Petitioner.  (Doc. No. 35 at 1.)  Their

---

[1]   Section 2254 provides in relevant part that:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
> entertain an application for a writ of habeas corpus [o]n behalf of a person in
> custody pursuant to the judgment of a State court only on the ground that he is in
> custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

testimony was critical to Petitioner's conviction, explaining Petitioner's role in the drug enterprise and translating recordings of coded phone calls for the jury on which Petitioner allegedly discussed drug transactions.  (See Doc. No. 5-5 at 57:2-8, 58:10-17.)

Years later, in November 2022, Petitioner learned for the first time that two weeks after Contreras testified against him at trial, Contreras entered into a plea deal with Respondents.  (Doc. No. 32 at 10:21-11:5.)  Similarly, Baez-Betances entered a guilty plea in 2020.[2]  (See id. at 47:2-3.)  However, at Petitioner's trial, while both Contreras and Baez-Betances acknowledged that they had charges pending against them, they denied that Respondents had made them any promises of leniency on their pending charges in exchange for their testimony against Petitioner.  (See Doc. No. 5-5 at 51:5-14, 73:24-74:1, 111:2-17.)  Had Respondents promised Contreras and Baez-Betances leniency in exchange for their testimony against Petitioner, they would have been required to disclose the existence of such promises to Petitioner under Brady v. State of Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972).[3]

---

[2]    As explained below, Baez-Betances did not enter his guilty plea until 2020 because, in addition to testifying against Petitioner, he also had agreed to testify for Respondents against another member of the narcotics distribution organization.  (See Doc. No. 32 at 46:13-17.)  As such, he did not enter his guilty plea until the case for that other member of the drug enterprise had closed.  (See id.)  Petitioner, however, did not become aware of Baez-Betances's guilty plea until June 10, 2024, when Respondents filed the plea agreement on the record pursuant to the Court's Order for Respondents to produce certain documents ahead of the evidentiary hearing on the Petition.  (See Doc. Nos. 11, 16.)

[3]    In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process [under the Fourteenth Amendment] where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  Brady v. State of Maryland, 373 U.S. 83, 87 (1963).  Later, in Giglio, the Supreme Court clarified that the rule announced in Brady also applies to impeachment evidence, that is, evidence tending to undermine a witness's credibility, such as a promise made by the prosecution to its key witness that the witness would not be prosecuted if he testified for the prosecution.  Giglio v. United States, 405 U.S. 150, 154 (1972).

Given this requirement, Petitioner filed the instant Petition for a Writ of Habeas Corpus, alleging Respondents violated <u>Brady</u> and <u>Giglio</u> by not disclosing to Petitioner and the jury the promises of leniency they had with Contreras and Baez-Betances in exchange for their testimony against Petitioner.[4]  (Doc. No. 1 at 32-33.)  He also alleges that the prosecution violated <u>Napue v. People of the State of Illinois</u>, 360 U.S. 264 (1959), by failing to correct the false testimony of Contreras and Baez-Betances that they were not testifying against Petitioner in exchange for leniency from Respondents.[5]  (<u>Id.</u> at 34.)  Respondents argue to the contrary that they did not violate <u>Brady</u>, <u>Giglio</u>, or <u>Napue</u> because they had not made any explicit promises of leniency to Contreras or Baez-Betances.  (<u>See</u> Doc. No. 37.)

But as the Court explains below, while Respondents did not make explicit promises of leniency to Contreras and Baez-Betances, they did have understandings that leniency would be afforded to them.  At the evidentiary hearing on the Petition, a Berks County assistant district attorney explained that Respondents have a policy to never make promises of leniency to cooperating defendants, yet in almost every case where a cooperating defendant pleads guilty, Respondents agree to drop at least some of the charges pending against that defendant.  Moreover, which charges Respondents agree to drop are influenced by the defendant's level of cooperation.

---

[4]    In the Petition for a Writ of Habeas Corpus, Petitioner's <u>Brady</u> and <u>Giglio</u> claim focuses only on Respondents' nondisclosure of Contreras's guilty plea.  (<u>See</u> Doc. No. 1.)  He did not add the nondisclosure of Baez-Betances's plea agreement to his <u>Brady</u> and <u>Giglio</u> argument until he filed the Supplemental Memorandum on March 2, 2025 after receiving the information from Respondents pursuant to this Court's Order (Doc. No. 11) for Baez-Betances's plea agreement to be produced with other items.  (<u>See</u> Doc. No. 35.)

[5]    In <u>Napue</u>, the Supreme Court reiterated the principle that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  <u>Napue v. People of the State of Illinois</u>, 360 U.S. 264, 269 (1959).  The Court then extended the principle to the prosecution's knowing use of false testimony, holding that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  <u>Id.</u>

Through this practice, Respondents bypass their <u>Brady</u> and <u>Giglio</u> disclosure requirement by refusing to make explicit promises of leniency to cooperating defendants, but nevertheless induce defendants to cooperate through the implicit understanding that Respondents will drop some of the charges pending against them.

Thus, defendants such as Contreras and Baez-Betances agree to cooperate with the understanding that their cooperation will lead to leniency by Respondents when the defendants eventually enter into plea deals with Respondents. But explicit promise or not, where Respondents have an understanding of leniency with a cooperating defendant, Respondents have a duty under <u>Brady</u> and <u>Giglio</u> to disclose this understanding to a defendant in a criminal case for disclosure to the jury. Therefore, because Respondents did not disclose their understandings of leniency with Contreras and Baez-Betances to Petitioner or to the jury at trial, Respondents violated Petitioner's Fourteenth Amendment right to due process as established in <u>Brady</u> and <u>Giglio</u>. For this reason, and more that follow, the Court will not approve and adopt the R&R (Doc. No. 9), sustain Petitioner's Objections to the R&R (Doc. No. 10), and grant the Petition for a Writ of Habeas Corpus (Doc. No. 1).

## II.    BACKGROUND

### A.    Petitioner's State Trial

On June 3, 2015, the Berks County District Attorney filed charges against Petitioner for "his involvement in a narcotics distribution organization." (Doc. No. 5 at 1.) A summary of the investigation leading to the filing of these charges is as follows:

> In January of 2015, the Reading Police Department became involved with a Pennsylvania State Police [("PSP")] investigation into a drug trafficking organization operating in the area of Berks County and reaching into Schuylkill County. Initially, the investigation focused on Nelson Guzman, who the PSP targeted through confidential sources. Guzman was trafficking in methamphetamine in the area of Reading, Pennsylvania. Through several

controlled buys with Guzman, and information provided by confidential informants, investigators learned that Guzman was dealing with a variety of drugs including methamphetamine, heroin, marijuana and cocaine. Once enough information was compiled, investigators applied for a wiretap of Guzman's cell phone, which was approved. Through the wiretap, investigators learned that an individual named Erick Nunez was supplying cocaine to Guzman.

Additional wire taps on the Nunez phone and subsequent surveillance led investigators to identify Nunez as receiving cocaine from Popote. As part of the investigation, law enforcement also received authorization to wiretap two cell phone numbers associated with Popote. One of the cell phones was registered to Popote. The other cell phone was registered to a separate address for the prepaid cell phone company. Investigators were able to link the second cell phone to Popote through recognition of his voice on other calls, internal conversation references, and through surveillance. During the course of the investigation, law enforcement intercepted between 8,000 and 11,000 voice calls and text messages through the organization. At the conclusion of the investigation, more than twenty individuals involved in the drug organization [including Popote] were arrested and charged.

(Doc. No. 1 at 19-20.)  Based on his involvement in the narcotics distribution organization,

Petitioner was charged with the following crimes:

[O]ne count each of Corrupt Organizations [in violation of] 18 [Pa. Cons. Stat. §] 911(b)(1), conspiracy to commit corrupt organizations [in violation of] 18 [Pa. Cons. Stat. §] 911 (b)(4), nineteen counts each of dealing in proceeds of unlawful activities [in violation of] 18 [Pa. Cons. Stat. §§] 5111(a)(1) and 7512(a), criminal use of a communications facility [in violation of] 18 [Pa. Cons. Stat. §] 7512(a), possession with intent to deliver a controlled substance [in violation of] 35 [Pa. Stats. §] 780-113(a)(30), possession of a controlled substance [in violation of] 35 [Pa. Stats. §] 780-113(a)(l6), and conspiracy to commit possession with intent to deliver a controlled substance [in violation of]18 [Pa. Cons. Stat. §] 903(a)(l).

(Id. at 18-19.)

On January 30, 2017, a jury trial began on these charges.  (Doc. No. 5 at 1.)  During trial,

Rafael Contreras ("Contreras") and Juan Baez-Betances ("Baez-Betances") testified as

prosecution witnesses.  (Doc. No. 35 at 1.)  Contreras and Baez-Betances were co-defendants

charged for their involvement in the same narcotics distribution organization as Petitioner.  (Doc.

No. 35 at 1.)  The prosecution also called several law enforcement officers, including Pennsylvania

State Trooper Troy Greenawald ("Trooper Greenawald"), to testify regarding the investigation of Petitioner. (See Doc. No. 1 at 22-28.)

As evidence against Petitioner, the prosecution introduced a number of recorded phone calls that it had intercepted during its wiretap of the narcotics distribution organization. These recordings included calls between Petitioner and Contreras as well as between Petitioner and Baez-Betances in which, according to the witnesses, they would discuss drug transactions. (See, e.g., Doc. No. 5-5 at 57:2-8, 58:10-17.) The calls were mostly in Spanish and the witnesses said they spoke about the drug transactions in code. (See id.)

### 1.    Rafael Contreras's Testimony[6]

At the beginning of Contreras's testimony, he stated that he was aware that he currently has charges pending against him for his role as a member of a corrupt organization whose purpose was to distribute narcotics. (Doc. No. 5-5 at 50:5-16.) Importantly, when the prosecutor asked Contreras if he was testifying against Petitioner in exchange for the state's promise of leniency on his pending charges, he said no. (Id. at 51:5-14, 73:24-74:1.) Instead, Contreras said he was testifying against Petitioner for "consideration" from the state. (See id.) Specifically, he testified as follows:

> Prosecutor:  Now, you're here to testify on behalf of the Commonwealth. Has anything been promised to you in exchange for your testimony?
>
> Contreras:  No.
>
> Prosecutor:  Now, let's be honest. Are you hoping for some consideration?
>
> Contreras:  Some consideration, nothing else.
>
> Prosecutor:  But at this point nothing has actually been promised to you?

---

[6]  Contreras testified that he is fluent in Spanish and does not speak English. (See Doc. No. 5-5 at 49:24-25, 50:1-4.) As such, he testified using a Spanish interpreter. (See id. at 49:24.)

Contreras:  Nothing.

***

Prosecutor:  One more time, you haven't been promised anything?

Contreras:  No.

(Id.)

During his testimony, Contreras listened to several recorded phone calls played in court, identified Petitioner's voice on the calls, and explained to the jury certain code words used on the calls when discussing drug transactions.  (See, e.g., id. at 57:2-8, 58:10-17.)  For example, concerning one phone call, Contreras testified as follows:

Prosecutor:  Who were the voices on that phone call?

Contreras:  Mine and Popote's.

Prosecutor:  Are you sure that one of the voices on that phone call is Rafael Popote?

Contreras:  Yes.

Prosecutor:  What is that phone call about?

Contreras:  About cocaine.

***

Prosecutor:  . . . In that phone call, Mr. Popote asks you for 28 dollars.  What is he asking for?

Contreras:  28 grams.

Prosecutor:  Of cocaine?

Contreras:  Yes.

Prosecutor:  And you tell him you only have 15 dollars.  What are you telling him?

Contreras:  That I only have 15 grams.

(Id.)  Contreras also stated that he stored cocaine at his house for Petitioner and sometimes bought cocaine from Petitioner to sell to his own clients.  (Id. at 53:17-21, 54:12-16.)

### 2.    Juan Baez-Betances's Testimony

Like Contreras, Baez-Betances's testimony began with him acknowledging that he currently had charges pending against him for his role as a member of a corrupt organization whose purpose was to distribute narcotics.  (Id. at 84:6-16.)  When the prosecutor asked Baez-Betances if he was testifying against Petitioner in exchange for a promise of leniency from the state, he also said no, stating the following:

> Prosecutor:  . . . This was your decision to come in and testify today?
>
> Baez-Betances:  Yes.
>
> Prosecutor:  Are you – are you hoping for consideration from the Commonwealth?
>
> Baez-Betances:  I hope.
>
> Prosecutor:  Have you been promised anything?
>
> Baez-Betances:  No.
>
> Prosecutor:  Has the Commonwealth told you exactly, you know, what's going to happen to you if you cooperated?
>
> Baez-Betances:  No.
>
> Prosecutor:  Have I made you any promises?
>
> Baez-Betances:  No.
>
> Prosecutor:  Have either of the detectives made you any promises?
>
> Baez-Betances:  No.

(Id. at 111:2-17.)  Similarly, on cross-examination when Petitioner's trial attorney asked Baez-Betances if he was promised anything by the state in exchange for his testimony, he again said no:

<u>Defense attorney</u>:  Okay.  Now, sir, they found quite a bit of stuff in your house when they searched it.  So you could be looking at a pretty considerable amount of time for this; isn't it a fact?

<u>Baez-Betances</u>:  Yes.

<u>Defense attorney</u>:  Okay.  So when the [District Attorney] came to you, he suggested that you might help yourself by bringing Popote into this; isn't that a fact?

<u>Baez-Betances</u>:  Yes.

<u>Defense attorney</u>:  Okay.  And, obviously, it is your hope that you will get consideration with your eventual deal if you bring Popote into this; isn't that a fact?

<u>Baez-Betances</u>:  I hope so, but I wasn't promised anything.

(<u>Id.</u> at 116:10-22.)

On direct examination, Baez-Betances testified that he occasionally worked for Petitioner, sometimes delivering drugs at Petitioner's request, sometimes driving Petitioner around, and, on one occasion, taking over Petitioner's entire drug operation when he was out of town.  (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 87:15-17, 88:18019, 89:21-23, 96:16-25, 97:17-19.)  He also echoed Contreras's testimony regarding the recorded phone calls, identifying Petitioner's voice on the calls and explaining the code words Petitioner used on the phone when discussing drug transactions.  (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 91:8-23.)  For example, Baez-Betances testified as follows:

<u>Prosecutor</u>:  Okay.  Now, when you would speak on the phone, would you ever talk about cocaine?

<u>Baez-Betances</u>:  Yes.

<u>Prosecutor</u>:  Would you come right out and say the word, cocaine?

<u>Baez-Betances</u>:  No.

***

<u>Prosecutor</u>:  How would you talk about it?

<u>Baez-Betances</u>:  Codes.

> <u>Prosecutor</u>:  Codes.  The word, dollars, if someone said, I need 15 dollars, what were they asking for?
>
> <u>Baez-Betances</u>:  15 grams of cocaine.
>
> <u>Prosecutor</u>:  And if you asked someone if they had the tickets, what were you asking about?
>
> <u>Baez-Betances</u>:  Money.

(<u>Id.</u>)

### 3.    Trooper Troy Greenawald's Testimony

In addition to a number of other law enforcement officers, Pennsylvania State Trooper Troy Greenawald testified on behalf of the prosecution.  (<u>See</u> Doc. No. 1 at 23.)  Petitioner summarizes Trooper Greenawald's trial testimony as follows:

> Pennsylvania State Trooper Troy Greenawald testified that he became involved in a narcotics investigation in 2015. He testified about "Operation IceOut." He testified that he was able to identify Popote's voice and associate it with other phone calls and surveillance. He interpreted several telephone calls between Popote and Juan Baez-Betances that he believed referenced drug deliveries. He stated that on one occasion, the two men were referring to "borrowing ten dollars" and asking for a "Baby" which Trooper Greenawald interpreted as a reference to drug deliveries. Trooper Greenawald never saw Petitioner possess drugs or have drugs in his house or car.

(<u>Id.</u>)

### B.    Post-Trial Procedural History

On February 2, 2017, the jury found Petitioner guilty on all counts and, on February 17, 2017, the trial court sentenced him to an aggregate term of imprisonment of 26 to 55 years in a state correctional facility followed by 22 years of probation.  (Doc. No. 5 at 1-2.)  On February 23, 2017, Petitioner's trial counsel filed a post-trial motion, challenging the weight of the evidence, the trial court's admission of certain testimony as lay testimony, and Petitioner's sentence.  (<u>Id.</u> at 2.)  On February 27, 2017, the trial court denied the motion.  (<u>Id.</u>)

On March 15, 2017, Petitioner, through new counsel, filed a timely notice of appeal to the Pennsylvania Superior Court.  (Id.)  On November 7, 2018, the Pennsylvania Superior Court denied Petitioner's appeal, after which Petitioner did not file a petition for allowance of appeal. (Id.; see also Doc. No. 5-6 at 121.)

On October 31, 2019, Petitioner filed a counseled petition under the Post-Conviction Collateral Relief Act ("PCRA"), alleging his trial counsel was ineffective for failing to call character witnesses.  (Id. at 2-3.)  On July 27, 2020, after a hearing on the merits, the trial court denied the PCRA petition.  (Id. at 3.)  Thereafter, Petitioner filed both a pro se and counseled notice of appeal.  (Id.)  On April 1, 2021, the Pennsylvania Superior Court denied the appeal.  (Id.)  On April 27, 2021, Petitioner's counsel filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which the Pennsylvania Supreme Court denied on August 6, 2021.  (Id.) Following this denial, Petitioner did not seek allocatur to the United States Supreme Court.  (Id.)

On December 1, 2022, Petitioner filed the instant Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  (Doc. No. 1.)  On December 27, 2022, the Court referred the Petition to a Magistrate Judge for a Report and Recommendation ("R&R").  (Doc. No. 2.)  On January 12, 2023, Respondents filed an Answer to the Petition.  (Doc. No. 5.)  On June 1, 2023, the Magistrate Judge ordered Petitioner to file a brief, addressing why the Petition is timely and why it is not procedurally defaulted.  (Doc. No. 7.)  On June 29, 2023, Petitioner filed the brief as ordered. (Doc. No. 8.)

On July 10, 2023, the Magistrate Judge issued a R&R, recommending that the Court dismiss the Petition as untimely.  (Doc. No. 9.)  On July 23, 2023, Petitioner filed Objections to the R&R.  (Doc. No. 10.)  On February 5, 2025, this Court held an evidentiary hearing on the claims made in the Petition.  (See Doc. No. 32.)

### C.    Evidentiary Hearing

At the evidentiary hearing, the Court heard the testimony of Petitioner, Berks County Assistant District Attorney Jacquelin Hamer ("ADA Hamer"), and Berks County Assistant District Attorney Kenneth Kelecic ("ADA Kelecic").  (See Doc. No. 32.)

### 1.    Petitioner's Testimony[7]

In his testimony, Petitioner first explained the events leading up to the filing of his Petition. He testified that, in 2022, his family hired a lawyer, Cheryl Sturm, Esquire ("Sturm"), to help him continue to seek post-conviction relief.  (See id. at 10:18-20.)  He initially met with Sturm on November 11, 2022, at which time Sturm showed Petitioner an online article about Rafael Contreras.  (Id. at 10:21-11:5.)  The article, titled "Reading man pleads guilty in cocaine-trafficking case," was originally published on February 15, 2017 and later updated on August 19, 2021.  (See Doc. No. 14 at 3.)  The article states in pertinent part as follows:

> A Reading man thanked a Berks County judge Monday for accepting a plea agreement in his cocaine-trafficking case.
>
> Rafael Contreras, 42, . . . pleaded guilty before President Judge Paul M. Yatron to criminal use of a communication facility and intending to deliver cocaine.
>
> ***
>
> Contreras, who is not a legal citizen, said he also understood that he will likely be deported to the Dominican Republic because of his conviction.
>
> The judge and prosecutors acknowledged Contreras' cooperation throughout the case, including his testimony two weeks ago during the trial against Raphael [sic] Mueses-Popote.

(Id.)

---

[7]    During the evidentiary hearing, Petitioner testified that his native language is Spanish, he does not speak English well, and at his 2017 state trial, he used a Spanish interpreter.  (Doc. No. 32 at 7:20-24, 8:16-21.)  Petitioner also used a Spanish interpreter at the evidentiary hearing on the Petition.  (See id. at 4:1.)

Petitioner then testified that he has been in prison and had no access to a computer since

February 2, 2017, the date he entered into the state's custody:

> Counsel for Petitioner:  Now, before your verdict of guilty on February the 2nd, 2017, were you out on bail and free to come and go to the trial?
>
> Petitioner:  Yes.
>
> Counsel for Petitioner:  And when the verdict of guilty was entered on February the 2nd, 2017, did the judge immediately revoke your bail?
>
> Petitioner:  Yes.
>
> Counsel for Petitioner:  And when the judge revoked your bail, where did you go?
>
> Petitioner:  County prison.
>
> ***
>
> Counsel for Petitioner:  And you were sentenced in this case on February the 17th of 2017, is that true?
>
> Petitioner:  Yes.
>
> Counsel for Petitioner:  And between the time that you were put in prison on February the 2nd, 2017, and your sentencing on February 17th, 2017, did you have access to any computers?
>
> ***
>
> Petitioner:  Not as far as I could recall.
>
> Counsel for Petitioner:  And when you were sentenced on February the 17th, 2017, were you sentenced to approximately 26 years to 55 years incarceration?
>
> Petitioner:  Yes.
>
> Counsel for Petitioner:  And you were transferred after your sentence to State prison?
>
> Petitioner:  Yes.
>
> Counsel for Petitioner:  And you are currently in State prison?
>
> Petitioner:  Yes.

15

<u>Counsel for Petitioner</u>: . . . Between February the 17th, 2017, and August 19, 2021, did you have access to any computers that would provide you with news from the outside?

<u>Petitioner</u>: Not as far as I can recall.

(Doc. No. 32 at 8:22-10:10.)

### 2.    Assistant District Attorney Jacquelin Hamer's Testimony

Next, ADA Hamer testified that she has been employed as an assistant district attorney at the Berks County District Attorney's Office since July 2007. (<u>Id.</u> at 18:1-4.) She explained that she became involved in a wiretap investigation into a narcotics distribution organization in 2015. (<u>Id.</u> at 18:8-11.) When she became involved with this investigation, persons in the Berks County DA's Office had already set up a wiretap on the individuals it suspected of being involved in the organization. (<u>See</u> <u>id.</u> at 18:14-15.) From this investigation, 22 total defendants were charged with drug-related offenses, including Petitioner, Contreras, and Baez-Betances. (<u>Id.</u> at 18:25-19:22.) Of these 22 defendants, ADA Hamer was put in charge of prosecuting 11 defendants, while ADA Kelecic was in charge of prosecuting the other 11 defendants. (<u>Id.</u> at 19:2-7.) While ADA Kelecic was assigned to the prosecution of Petitioner, Contreras, and Baez-Betances, ADA Hamer helped ADA Kelecic with Petitioner's trial. (<u>Id.</u> at 19:17-20:13.) However, she did not help ADA Kelecic with preparing Contreras and Baez-Betances to testify at Petitioner's trial, nor was she the prosecutor who questioned them at trial. (<u>See</u> <u>id.</u> at 20:14-25.)

She further explained that she did not meet with Contreras, Baez-Betances, or their respective counsel before Petitioner's trial and did not extend an offer of leniency to them in exchange for their testimony. (<u>Id.</u> at 21:16-22:3.) She also denied threatening or coercing Contreras and Baez-Betances into testifying, nor influencing their testimony in any way. (<u>Id.</u> at

22:4-10.)  Finally, she testified that, after Petitioner's trial was over, she did not have anything to do with Contreras's and Baez-Betances's plea agreements.  (Id. at 22:11-14.)

### 3.    Assistant District Attorney Kenneth Kelecic's Testimony

ADA Kelecic testified that he has been employed as an assistant district attorney at the Berks County DA's Office since October 2014.  (Id. at 24:1-5.)  Before that, he spent 8 years working as an assistant public defender in Berks County.  (Id. at 24:6-9.)  Like ADA Hamer, he became involved in the wiretap investigation into the narcotics distribution organization in 2015. (Id. at 24:10-14.)  And, as explained above, when the Berks County DA filed charges against 22 defendants as a result of this investigation, ADA Hamer was put in charge of prosecuting 11 of the defendants while ADA Kelecic was in charge of prosecuting the other 11 defendants.  (Id. at 26:5-14.)  Included in the 11 defendants ADA Kelecic was in charge of prosecuting were Petitioner, Contreras, and Baez-Betances.  (Id. at 26:15-16, 27:4-10.)

According to ADA Kelecic, soon after the Berks County DA had filed charges against Contreras and Baez-Betances, their respective counsel reached out to inform him that their clients would be willing to cooperate with law enforcement.  (Id. at 27:18-24.)  As part of their cooperation, ADA Kelecic met with both Contreras and Baez-Betances prior to Petitioner's trial. (See id. at 28:6-9, 32:17-23.)

ADA Kelecic first met with Contreras on August 31, 2016, along with Contreras's attorney, two members of state law enforcement, and a Spanish interpreter.  (Id. at 28:7-9, 28:20-23, 29:1-3.)  During this meeting, Contreras explained his role in the drug operation, including who else was involved and their respective roles in the organization, as well as identified voices on recorded phone calls.  (Id. at 28:12-16.)  At the conclusion of the meeting, Contreras signed a typed statement, referred to as a proffer statement, reflecting the questions asked during the meeting and

his answers.  (Id. at 29:11-13.)  At the end of the meeting, as reflected in the portion of the proffer

statement reproduced below, Contreras denied being offered anything by the prosecution in

exchange for his cooperation, stating as follows:

> Q:  Have you been threatened in any way or promised anything in exchange for this statement?
>
> A:  No.
>
> Q:  What do you believe you will receive in exchange for your cooperation in this investigation?
>
> A:  Nada [which translates to "nothing" in Spanish].  I hope that I will get consideration with my sentence and with my deportation.  I have not been guaranteed that I will get anything.  Nada.

(See id. at D-1; see also id. at 31:14-24.)  Moreover, during his testimony at the evidentiary hearing,

ADA Kelecic emphasized that no promises of leniency had been made to Contreras or his counsel

in exchange for his testimony against Popote:

> Counsel for Respondents:  Okay.  Did you promise anything to [Contreras] in exchange for his testimony?
>
> ADA Kelecic:  No.  The conversation we had with Mr. Contreras, because it is the same conversation I have any time I conduct one of these proffer agreements, is that we are not promising a defendant anything in exchange for their testimony.  We understand that they are looking for consideration for their helping the Commonwealth, but we do not promise them anything in exchange for their cooperation.  That does not get worked out until after they have completed their cooperation.

(Id. at 32:4-13.)

On September 1, 2016, one day after meeting with Contreras, ADA Kelecic met with Baez-

Betances for the first time, along with Baez-Betances's attorney and two members of state law

enforcement.  (Id. at 32:22-33:2.)  Like Contreras, during this meeting, Baez-Betances explained

his role in the drug operation and who else was involved, as well as identified voices on recorded

phone calls.  (Id. at 33:6-11.)  At the end of the meeting, Baez-Betances also signed a proffer

statement that reflected he had been asked the same questions as Contreras regarding whether he

had been promised anything in exchange for his testimony against Petitioner:

> Q:  Have you been threatened in any way or promised anything in exchange for this
> statement?
>
> A:  No.
>
> Q:  What do you believe you will receive in exchange for your cooperation in this
> investigation?
>
> A:  I don't know.

(See id. at D-2; see also id. at 34:19-24.)   At the evidentiary hearing, ADA Kelecic again

emphasized that no promises of leniency were made to Baez-Betances or his counsel in exchange

for his testimony against Petitioner, explaining the following:

> Counsel for Respondents:  Okay.  So, during that [September 1, 2016] meeting, did
> you have any discussions with Mr. Baez-Betances or his counsel about what they
> may expect in exchange for their testimony against Mr. Popote?
>
> ADA Kelecic:  We specifically informed him that we were not promising him
> anything, and we were not entering into any agreements with him at that point.
> Much as I said with Mr. Contreras, it's the same conversation I have every time we
> do one of these proffers, which is we are not promising you anything.  But we
> understand that you are looking for consideration in exchange for your testimony,
> but we're not promising you anything at this time.

(Id. at 34:25-35:11.)  ADA Kelecic further testified that he again met with Contreras and Baez-

Betances, separately, on two other occasions in order to prepare their trial testimony against

Petitioner.  (Id. at 35:18-36:4.)

After Contreras and Baez-Betances testified against Petitioner, they entered into guilty plea

agreements with the Berks County DA.  (Id. at 37:13-16.)  ADA Kelecic was the only assistant

district attorney involved in negotiating these pleas.  (Id. at 37:17-22.)  Contreras entered his guilty

plea on February 15, 2016, roughly two weeks after Petitioner's trial ended, and received a

sentence within the standard range for the crimes to which he pled guilty.  (Id. at 38:10-15, 39:3-

6, 42:15-43:8.)  Baez-Betances, however, did not enter into his guilty plea until 2020.  (Id. at 47:2-

3.)  ADA Kelecic explained that part of the delay in entering the guilty plea was because, in

addition to testifying against Petitioner, Baez-Betances was also going to testify for the state

against another member of the narcotics distribution organization.  (Id. at 46:13-17.)

      Throughout the time leading up to their testimony against Petitioner, ADA Kelecic denied

making Contreras and Baez-Betances any promises of leniency in exchange for their testimony,

threatening or coercing them into testifying, or acting in any way to influence their testimony.  (Id.

at 36:9-15, 37:6-12, 47:22-48:4.)  He additionally denied speaking to counsel for Contreras and

Baez-Betances about what their clients may receive in exchange for their testimony.  (Id. at 37:2-

5.)  This, ADA Kelecic explained, was in accordance with the Berks County DA's policy to not

make defendants any promises of leniency before they cooperate.  (See id. at 67:22-68:2.)

      Next, Petitioner's counsel asked ADA Kelecic about the recorded phone calls used as

evidence against Petitioner at his trial.  (See id. at 49.)  ADA Kelecic explained that, during his

pre-trial meetings with Contreras and Baez-Betances, they were played recordings of these calls

and asked to identify the speakers and the code words used throughout the calls.  (Id. at 50:21-

51:6.)  Because the recorded calls were mostly in Spanish, the calls were initially translated by

bilingual law enforcement officers but, during their respective meetings, Contreras and Baez-

Betances also translated the calls and provided an explanation for the codes used on the calls,

which ADA Kelecic acknowledged was "helpful in verifying what the law enforcement officers

already believed that the phone calls meant."  (Id. at 50:12-13, 51:10-12.)

      At Petitioner's trial, Pennsylvania State Trooper Troy Greenawald was presented by the

state as an expert witness to testify to his opinion on the meaning behind what was said on the

recorded phone calls.  (Id. at 49:5-7.)  However, because the calls were mostly in Spanish and

Trooper Greenawald did not speak Spanish, ADA Kelecic agreed that Trooper Greenawald's opinion testimony on the meaning of the phone calls was reliant upon the interpretations by Contreras and Baez-Betances as well as the bilingual law enforcement officers. (See id. at 53:4-6.)

Petitioner's counsel then asked ADA Kelecic about his experience with plea deals from the 6 years he spent working as a public defender in Berks County. (Id. at 53:15-54:3.) ADA Kelecic testified that, during these 6 years, he negotiated thousands of plea deals in Berks County. (Id. at 54:4-6.) Drawing on this experience, as well as his experience working as an assistant district attorney in Berks County, ADA Kelecic explained that "99 percent of cases" in Berks County where a defendant charged with multiple crimes pleads guilty, some of the charges pending against that defendant get dropped. (Id. at 56:5-8.) Moreover, ADA Kelecic agreed that, in this type of situation where a defendant enters into a plea agreement, the Berks County prosecutors and public defenders implicitly understand that this cooperation will lead to certain charges being dropped. (Id. at 58:4-11, 59:23-25.) And he stated that when he worked as a public defender, he would typically give his clients the advice that, if they enter into a plea agreement, some of the charges pending against them will be dropped. (Id. at 66:25-67:11.)

However, while a Berks County defendant entering into a plea agreement might know that doing so will guarantee that some of the charges pending against him will be dropped, he does not know which exact charges the prosecutors will agree to drop nor what sentence he will ultimately receive. (Id. at 69:2-10.) As counsel for Respondents phrased it at the evidentiary hearing, "the only expectation that could be had by any defendant who offers cooperation is that at some point in the future, if they enter a guilty plea, that some unknown charges, unidentified charges are going to be dropped from the information[.]" (Id. at 69:11-16.)

21

Despite this uncertainty, ADA Kelecic explained that which charges the Berks County DA agrees to drop may be influenced by the defendant's cooperation with the prosecution.  (Id. at 70:3-11.)  Said differently, if a cooperating defendant pleads guilty, the charges that the Berks County DA agrees to drop in the guilty plea may be different from the charges it would have agreed to drop had the defendant not cooperated.  (See id. at 70:6-18.)  And, importantly, the exact charges to which a defendant pleads guilty can affect the length of the sentence that the defendant is facing. (See id. at 70:19-22.)

In Contreras's case, the Berks County DA charged him with 41 crimes relating to his involvement in the narcotics distribution organization.  (Id. at 57:14-15.)  However, after Contreras entered into a plea agreement and testified against Petitioner on behalf of the prosecution, he ultimately only pled guilty to 2 of the 41 crimes he was charged with, meaning the Berks County DA agreed to drop 39 charges.  (Id. at 57:13-23.)  And because the Berks County DA dismissed these 39 charges against Contreras, ADA Kelecic agreed that Contreras's plea agreement "saved him[] an enormous amount of time, potentially, that he could have been sentenced to."  (Id. at 60:13-17.)  Ultimately, Contreras received a sentence of time served, receiving credit for the 621 days he had spent in custody following his initial arrest.  (Id. at 60:20-61:2.)

Baez-Betances also saved himself a significant amount of potential time in prison by agreeing to a plea deal with the Berks County DA.  (Id. at 61:5-17.)  He was facing 47 years' imprisonment and a $65,000 fine but, after entering into a plea agreement with the Berks County DA and testifying against Petitioner and one other member of the narcotics distribution organization, Baez-Betances instead received a sentence of "364 days' time served" along with 10 years of probation.  (Id. at 61:9-62:2.)

### D.    Subsequent Procedural History

On February 5, 2025, following the evidentiary hearing, the Court granted the parties leave to file supplemental memoranda.    (Doc. No. 30.)    On March 2, 2024, Petitioner filed a Supplemental Memorandum in opposition to the R&R.    (Doc. No. 35.)    On March 19, 2025, Respondents filed a Supplemental Memorandum in support of the R&R.    (Doc. No. 37.)    The Petitioner for a Writ of Habeas Corpus (Doc. No. 1) is now ripe for disposition.

## III.    STANDARD OF REVIEW

### A.    Review of a Magistrate Report and Recommendation

Under 28 U.S.C. § 636(b)(1)(B) and the local rules of this Court, a district judge is permitted to designate a magistrate judge to make proposed findings and recommendations on petitions for post-conviction relief.  See 28 U.S.C. § 636(b)(1)(B); E.D. PA. LOC. R. CIV. PRO. 72.1. Any party may file objections in response to the magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1)(C).  Whether or not an objection is made, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  Id.  "The [district] judge may also receive further evidence to recommit the matter to the magistrate judge with further instructions."  Id.  "[I]t must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court."  Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987); see also 28 U.S.C. § 636(b).

In the Eastern District of Pennsylvania, Local Rule 72.1.IV(b) governs a petitioner's objections to a magistrate judge's report and recommendation.  Under that rule, a petitioner must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections."  Savior v. Superintendent of Huntingdon SCI,

No. 11-5639, 2012 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012). Upon review, "[a district judge] shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C).

De novo review is non-deferential and generally permits the district court to conduct anew an "independent review" of the entire matter. <u>Salve Regina College v. Russell</u>, 499 U.S. 225, 238 (1991). "Although [the] review is <u>de novo</u>, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper." <u>Owens v. Beard</u>, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing <u>United States v. Raddatz</u>, 477 U.S. 667, 676 (1980)).

### B.    Merits Review of a Petition for a Writ of Habeas Corpus

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of a petition for a writ of habeas corpus will only be granted if: (1) the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) the court's decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A state court ruling is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). "Clearly established Federal law" has been defined by the United States Supreme Court as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Lockyear v. Andrade</u>, 538 U.S. 63, 71-72 (2003).

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court decisions, but

"unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407-08.  However, determinations of factual issues made by a state court "are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)); see also Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003).

Moreover, the state court's ruling must be "objectively unreasonable, not merely wrong." Virginia v. LeBlanc, 582 U.S. 91, 94 (2017) (internal citation omitted).  As the Third Circuit Court of Appeals has noted, "an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless the court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." Werts, 228 F.3d at 196 (citing Williams, 529 U.S. at 411).  Deference is given to state court rulings, and the application of the "contrary to" and "unreasonable application clauses" has proven to be "difficult to meet." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).

This burden is substantial.  And under the AEDPA, review of state court legal and factual determinations is highly deferential.  See Palmer v. Hendricks, 592 U.S. 386, 392 (3d Cir. 2010) ("AEDPA requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations.")  If a state court did not adjudicate a claim on the merits, however, the deferential standard of the AEDPA does not apply.  Id.  Rather, in such cases, "the federal habeas corpus court must conduct a de novo review over pure legal questions and mixed questions of law and fact . . . ." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

### C.     Timeliness and Exhaustion

Pursuant to the AEDPA, in addition to reviewing the merits of a petition for a writ of habeas corpus, a court must determine whether the petition has been timely filed and whether the petitioner has "exhausted the remedies available in the courts of the State."  See 28 U.S.C. § 2244(d); 28 U.S.C. § 2254(b).  First, concerning timeliness, the AEDPA imposes a one-year limitation period for habeas corpus petitions.  28 U.S.C. § 2244(d).  The time period begins to run from the latest of the following:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).

Next, § 2254(b) requires that the petitioner exhaust "the remedies available in the courts of the State" before bringing a petition for a writ of habeas corpus in federal court.  28 U.S.C. § 2254(b)(1)(A).  "In order for a claim to be exhausted, it must be 'fairly presented' to the state courts 'by invoking one complete round of the State's established appellate review process.'" Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002).

## IV.     ANALYSIS

### A.     Petitioner's State Conviction Was Obtained in Violation of **Brady** and **Giglio**

In the Petition for a Writ of Habeas Corpus, Petitioner alleges that Respondents obtained his conviction by violating his right to due process under the Fourteenth Amendment to the United

States Constitution.  (See Doc. Nos. 1, 35.)  Specifically, he argues that his right to due process

was violated when Respondents:  (1) "concealed favorable and material evidence that would have

impeached the credibility of [Rafael] Contreras and [Juan] Baez-Betances" in violation of Brady

and Giglio; and (2) failed to correct Contreras's and Baez-Betances's false trial testimony that they

had not been promised leniency in exchange for their testimony in violation of Napue.  (See Doc.

No. 35 at 6.)  Because Petitioner has established that Respondents violated Brady and Giglio,

which alone warrants a new trial, the Court need not address whether Respondents also violated

Napue.

In Brady, the petitioner and his co-defendant were convicted of first-degree murder and

sentenced to death.  Brady, 373 U.S. at 84.  Prior to trial, the petitioner's counsel requested that

the prosecution allow him to examine the co-defendant's extrajudicial statements.  Id.  While the

prosecution agreed to this request and allowed the petitioner's counsel to review the statements, it

withheld from review a statement where the co-defendant admitted that he committed the actual

murder.  Id.  On certiorari, the United States Supreme Court concluded that the prosecution's

withholding of the co-defendant's statement violated the petitioner's right to due process under the

Fourteenth Amendment.  Id. at 87.

In coming to this conclusion, the Court held that "the suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id.

Thus, "[t]o establish a Brady violation, it must be shown that (1) evidence was suppressed; (2) the

evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment."

United States v. Risha, 445 F.3d 298, 303 (3d Cir. 2006).

In <u>Giglio v. United States</u>, the Supreme Court extended its holding in <u>Brady</u> to impeachment evidence, that is, evidence affecting a witness's credibility.  405 U.S. 150, 154 (1972).  There, the petitioner was sentenced to five years' imprisonment after he was convicted of passing forged money orders.  <u>Id.</u> at 150.  While an appeal was pending in the Court of Appeals, the petitioner's defense counsel "discovered new evidence indicating that the Government had failed to disclose an alleged promise made to its key witness that he would not be prosecuted if he testified for the Government."  <u>Id.</u> at 150-51.  On certiorari, the Supreme Court considered "whether the evidence not disclosed was such as to require a new trial under the due process criteria of [<u>Napue</u>] and [<u>Brady</u>]."  <u>Id.</u> at 151.  The Court held that, after <u>Brady</u>, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within th[e] general rule" announced in <u>Brady</u> "that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution."  <u>Id.</u> at 153-54 (quotations and citations omitted).

Here, the Court will address each <u>Brady</u> requirement in turn.  However, because Petitioner's <u>Brady</u> and <u>Giglio</u> claim is premised on the idea that Respondents had an undisclosed leniency agreement with Contreras and Baez-Betances in exchange for their testimony against Petitioner, the Court must first determine whether such an agreement existed.

### 1.    Respondents Had Understandings of Leniency with Contreras and Baez-Betances

Because there was an implicit understanding that Respondents would dismiss at least some of the charges pending against Contreras and Baez-Betances in exchange for their testimony against Petitioner, this amounts to a leniency agreement for the purpose of <u>Brady</u> and <u>Giglio</u>.  As noted, in <u>Giglio</u>, the Supreme Court extended its holding in <u>Brady</u> to impeachment evidence.  <u>Id.</u> at 154.  Under <u>Giglio</u>, "evidence of any understanding or agreement as to a future prosecution [is]

relevant to [the witness's] credibility and the jury [is] entitled to know of it." Id. at 155. Interpreting this rule, courts have recognized that "Brady evidence is not limited to actual 'deals' or 'agreements' between witnesses and the government," but instead includes "even the possibility or expectation of favorable treatment." Harshman v. Superintendent, State Corr. Inst. at Rockview, 368 F. Supp. 3d 776, 790 (M.D. Pa. 2019).

For example, in Commonwealth v. Strong, the Pennsylvania Supreme Court considered whether the prosecution had an implicit understanding of leniency with its key witness. 761 A.2d 1167, 1171 (Pa. 2000). There, the petitioner was convicted of first-degree murder and sentenced to death after his alleged co-conspirator testified against him at trial. Id. at 1170. After testifying against the petitioner, the co-conspirator entered into a guilty plea on the charges of murder and kidnapping and received a sentence of 40 months' incarceration. Id.

On motion for post-conviction relief, however, the petitioner discovered letters between the prosecution and the co-conspirator's counsel, discussing a potential leniency agreement for the co-conspirator in exchange for his testimony against the petitioner. Id. While the letters were dated prior to the petitioner's trial, the prosecution had not disclosed these letters to the petitioner and had not informed the jury that the co-conspirator's testimony was pursuant to a leniency agreement. See id. At an evidentiary hearing on the post-conviction relief motion, the prosecutor testified that it was his office's practice "to avoid entering into plea agreements until after receiving the [witness's] cooperation" because "the jury would have to be apprised of any such agreement" under Brady. Id. at 1173. Instead, he stated "it was his 'normal course to indicate that truthful cooperation would get consideration'" and characterized a cooperating witness as testifying only "in hopes of getting consideration for himself." Id.

The Pennsylvania Supreme Court held that the circumstantial evidence of the charges against the co-conspirator, the letters discussing a potential plea deal, and the co-conspirator's eventual guilty plea "establishe[d] the existence of an understanding between the Commonwealth and [the co-conspirator] that he would be treated with considerable leniency in exchange for his testimony against [the petitioner]." Id. at 1174. In coming to this conclusion, the court noted that while "there was no definitive agreement between [the co-conspirator] and the prosecution, . . . the absence of an ironclad contract in exchange for [the co-conspirator's] testimony is not dispositive." Id.

Similarly, in Commonwealth v. Anderson, the Pennsylvania Court of Common Pleas considered whether the prosecution had violated Brady by failing to disclose to the jury an agreement for favorable consideration it had with a key witness. No. CP-21-CR-3342-2016, 2019 Pa. Dist. & Cnty. Dec. LEXIS 7735, at *1 (Pa. Commw. Ct. Sept. 6, 2019). There, the petitioner was convicted of first-degree murder by a jury due in large part to the witness's testimony against him. See id. at **1-2. However, prior to the petitioner's trial, the witness had been arrested and jailed on firearm charges. Id. at *2. In exchange for his testimony against the petitioner, the then-prosecutor promised the witness that all charges against him would be dropped. Id. After the witness testified before the grand jury, however, a new prosecutor took over the petitioner's case and told the witness that she was not offering him any deals in exchange for his testimony. Id. at *3. Despite this change, the witness still testified against the petitioner at his trial. See id. at *4.

During his testimony, the prosecutor asked the witness if there was any leniency deal in place in exchange for his testimony, which he denied, stating he had been told by the prosecution that they could not offer him a deal. Id. And while the petitioner's defense attorney theorized in his closing argument that the witness was testifying in the hope of receiving preferential treatment

from the prosecution in his firearms case, the prosecutor emphasized during her closing statement that the witness had been made no deals.  Id. at *3.  However, after the witness testified at the petitioner's trial, all charges against him were dropped.  Id. at *4.  At an evidentiary hearing on the petitioner's post-sentence motions, the prosecutor that handled the witness's firearms case testified that he told the witness's counsel that the DA's office did not make deals but would take the witness's cooperation into consideration when resolving his case.  Id. at *6.

Based on these facts, the Court of Common Pleas held that the prosecution had an understanding with the witness "that he would be treated with favorable consideration in exchange for his testimony."  Id. at **7-8.  In coming to this conclusion, it noted that an "offer of favorable consideration, even implicit, must be divulged" to the jury.  Id. at *5.  "As in Strong [discussed supra], this understanding, while not articulated in an ironclad agreement, was sufficient to implicate the due process protections of Brady."  Id. at *8.

Here, Respondents' policy for handling plea deals combined with the circumstantial evidence reveals that Contreras and Baez-Betances had understandings of leniency with Respondents.  First, due to Respondents' well-known policy of handling plea deals, Contreras and Baez-Betances had an implicit understanding with Respondents that they would receive leniency in return for their testimony against Petitioner.  According to ADA Kelecic, who has negotiated thousands of plea deals in Berks County both as a public defender and a prosecutor, Respondents have a policy not to make defendants any promises of leniency before they cooperate.  (See id. at 67:22-68:2.)  However, because "99 percent of cases" in Berks County where a defendant pleads guilty end with at least some charges against the defendant being dropped and exactly which charges will be dropped can be influenced by the defendant's cooperation, there is an implicit understanding between Berks County prosecutors and defense attorneys that a defendant's

cooperation will lead to leniency in the handling of the defendant's charges.  (See id. at 56:5-8, 70:3-11.)  Thus, when Contreras and Baez-Betances agreed to cooperate with Respondents, they likely did so on the advice of their respective counsel that such cooperation would lead to leniency from Respondents on the handling of their plea deals.  (See id. at 66:25-67:11.)

Respondents, however, argue that despite Contreras's and Baez-Betances's understanding that charges would be dropped if they pled guilty and cooperated with Respondents, there were no understandings of leniency because Contreras and Baez-Betances did not know before they entered into their respective pleas exactly which charges Respondents would agree to drop.  (Doc. No. 37 at 17-18.)  But even without knowing the exact charges Respondents would agree drop, the understanding that Respondents would drop any of the charges pending against Contreras and Baez-Betances is an understanding of leniency because the number of charges to which a defendant pleads guilty directly affects the defendant's ultimate sentence.  (See id. at 70:19-22.)

As explained above, it is not disputed that Respondents would have dropped at least some of the charges pending against Contreras and Baez-Betances solely because they agreed to plead guilty.  (See id. at 69:11-16 ("[T]he only expectation that could be had by any defendant [in Berks County] who offers cooperation is that at some point in the future, if they enter a guilty plea, that some unknown charges, unidentified charges are going to be dropped from the information").)  And because the number of charges to which a defendant pleads guilty affects the length of the sentence the defendant faces, Contreras and Baez-Betances were guaranteed at least some leniency from Respondents.  Thus, while they were undoubtedly hoping that their testimony against Petitioner would influence Respondents into dropping critical charges, Contreras and Baez-Betances testified against Petitioner with the understanding that Respondents would at least drop some of the charges pending against them.

Second, as in <u>Strong</u> and <u>Anderson</u>, the circumstantial evidence of the charges pending against Contreras and Baez-Betances followed by the significant plea deals they entered into with Respondents after they testified against Petitioner supports the conclusion that Respondents had understandings of leniency with Contreras and Baez-Betances.  Like the witnesses in <u>Strong</u> and <u>Anderson</u>, Contreras and Baez-Betances each had charges pending against them for their involvement in the narcotics distribution organization.  (<u>See</u> Doc. No. 5-5 at 50:5-16; 84:6-16.) And while the fact they had charges pending against them was communicated to the jury, both Contreras and Baez-Betances told the jury that they were not testifying against Petitioner in exchange for leniency from Respondents in the handling of their own cases.  (<u>Id.</u> at 51:5-14, 73:24-74:1, 111:2-17.)   Instead, they both stated that they were testifying in the hope of receiving consideration from Respondents.  (<u>See</u> <u>id.</u>)

Moreover, again like the witnesses in <u>Strong</u> and <u>Anderson</u>, after Contreras and Baez-Betances testified against Petitioner, they both entered into extremely favorable plea deals with Respondents.  For example, the witness in <u>Strong</u> was charged with the same murder and kidnapping charges as the petitioner.  <u>See</u> <u>Strong</u>, 761 A.2d at 1170.  Yet, after he testified against the petitioner, the witness agreed to a plea deal for only 40 months' incarceration while the petitioner, who was found guilty of the same charges at trial, was sentenced to death.  <u>See</u> <u>id.</u>  And the witness in <u>Anderson</u> was facing significant firearms charges but, after he testified against the petitioner, the prosecution dropped all charges pending against the witness.  <u>See</u> <u>Anderson</u>, 2019 Pa. Dist. & Cnty. Dec. LEXIS 7735, at *4.

Similarly, here, Contreras was charged with 41 crimes relating to his involvement in the same narcotics distribution organization as Petitioner.  (Doc. No. 32 at 57:14-15.)  But after he testified against Petitioner, Respondents dropped 39 of the pending charges, meaning Contreras

pled guilty to only 2 of the 41 crimes with which he was charged.  (Id. at 57:13-23.)  In ADA Kelecic's words, this plea deal "saved [Contreras] an enormous amount of time, potentially, that he could have been sentenced to."  (See id.)  Baez-Betances was also charged for his involvement in the same narcotics distribution organization as Petitioner and was facing 47 years in prison plus a $65,000 fine.  (Id. at 61:9-62:2.)  However, after testifying against Petitioner and another co-defendant, Baez-Betances agreed to a plea deal under which he was sentenced to only "364 days' time served" followed by 10 years' probation.  (See id.)  Thus, the fact that both Contreras and Baez-Betances had charges pending against them prior to their cooperation with Respondents and made clear that they were testifying against Petitioner in the hope that they would receive consideration from Respondents on these charges combined with the significantly lenient plea deals they both received serve as circumstantial evidence that they had understandings of leniency with Respondents.

Therefore, because Respondents had understandings of leniency with Contreras and Baez-Betances, the Court will next go through the three-part test to determine whether a Brady violation occurred.  See Risha, 445 F.3d at 303 ("To establish a Brady violation, it must be shown that (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment.")

### 2.    Evidence of the Understandings of Leniency Was Suppressed

First, Respondents did not disclose the existence of their understandings of leniency with Contreras and Baez-Betances to the jury, despite knowing that charges would be dropped which would expose them to a significantly lesser sentence.  During Contreras's testimony, he made clear to the jury that nothing had been promised to him in exchange for his testimony:

> Prosecutor:  Now, you're here to testify on behalf of the Commonwealth.  Has anything been promised to you in exchange for your testimony?

Contreras:  No.

Prosecutor:  Now, let's be honest. Are you hoping for some consideration?

Contreras:  Some consideration, nothing else.

Prosecutor:  But at this point nothing has actually been promised to you?

Contreras:  Nothing.

\*\*\*

Prosecutor:  One more time, you haven't been promised anything?

Contreras:  No.

(Doc. No. 5-5 at 51:5-14, 73:24-25, 74:1.)  Baez-Betances testified to the same:

Prosecutor:  . . . This was your decision to come in and testify today?

Baez-Betances:  Yes.

Prosecutor:  Are you – are you hoping for consideration from the Commonwealth?

Baez-Betances:  I hope.

Prosecutor:  Have you been promised anything?

Baez-Betances:  No.

Prosecutor:  Has the Commonwealth told you exactly, you know, what's going to happen to you if you cooperated?

Baez-Betances:  No.

Prosecutor:  Have I made you any promises?

Baez-Betances:  No.

Prosecutor:  Have either of the detectives made you any promises?

Baez-Betances:  No.

(Id. at 111:2-17.)

Through this testimony, Respondents led the jury to believe that Contreras and Baez-Betances were testifying against Petitioner for nothing more than the hope and prayer of receiving consideration. The jury would not have known based on this testimony that Contreras's and Baez-Betances's hope for consideration was more than a mere hope and prayer—it was an implicit understanding that their cooperation would lead to at least some leniency from Respondents in the form of dropped charges which could radically reduce their sentence exposure. Therefore, because this understanding of leniency with Contreras and Baez-Betances was not disclosed to the jury, the evidence was suppressed for the purpose of Brady and Giglio.

### 3.  Evidence of the Understandings of Leniency Is Favorable to the Defense

Next, the evidence of Respondents' understandings of leniency with Contreras and Baez-Betances is favorable to the defense as impeachment evidence. Under Brady and its progeny, the prosecution is only required to turn over evidence that is "favorable to the accused." See Harshman, 368 F. Supp. 3d at 790. This includes both exculpatory evidence as well as impeachment evidence. See Giglio, 405 U.S. at 154. "In the context of a government witness, this could mean impeachment evidence regarding favorable treatment or even the possibility or expectation of favorable treatment, evidence that impugns the reliability of the witness's testimony, and evidence of bias, prejudice, or ulterior motives affecting the witness's credibility." Harshman, 368 F. Supp. 3d at 790 (citations omitted).

Here, the information on Contreras's and Baez-Betances's understandings of leniency with Respondents could have been used as impeachment evidence. Specifically, the evidence of the understandings of leniency could have served to undermine the credibility of Contreras and Baez-Betances as witnesses by showing that, due to their cooperation, Respondents would drop some of the charges pending against them, thus exposing them to a significantly lesser sentence. And

36

because the evidence of the understandings of leniency could have served as impeachment evidence to undermine the credibility of Contreras and Baez-Betances, it is favorable to Petitioner. See Bridges v. Sec'y of Pa. Dep't of Corrs., 706 F. App'x 75, 82-83 (3d Cir. 2017) (finding that suppressed police reports of crimes committed by the testifying witness were favorable to the accused because, "[i]n short, this evidence could have been used to impeach [the witness] because it provided a basis to question whether [the witness] was motivated to testify in favor of the prosecution to ensure that the police did not pursue criminal charges against him").

### 4.    Evidence of the Understandings of Leniency Is Material

Finally, the evidence of Respondents' understandings of leniency with Contreras and Baez-Betances is material.  Evidence is considered material if "there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'"  Wearry v. Cain, 577 U.S. 385, 392 (2016) (quoting Giglio, 405 U.S. at 154).  To prevail on a Brady claim, a petitioner "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted," but instead "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict."  Id. (quoting Smith v. Cain, 565 U.S. 73, 75 (2010)).  "Evidence can be material even if it 'goes to the credibility of the witness.'"  Glossip v. Oklahoma, 145 S. Ct. 612, 628 (2025).  Moreover, "the materiality of withheld evidence must be 'considered collectively, not item by item.'"  Dennis v. Sec'y, Pa. Dep't of Corrs., 834 F.3d 263, 312 (3d Cir. 2016) (quoting Kyles v. Whitley, 514 U.S. 419, 436 (1995)).

Here, because evidence of Respondents' understandings of leniency could have affected the judgment of the jury, it is material.  As mentioned above, this evidence could have been used to impeach the credibility of Contreras and Baez-Betances, two of Respondents' key witnesses. The bulk of the evidence presented against Petitioner at trial were recorded phone calls that allegedly depicted Petitioner discussing various drug transactions.  (See Doc. No. 1 at 21.)  During

their trial testimony, Contreras and Baez-Betances listened to several of the recorded phone calls, identified Petitioner's voice on the calls, and explained to the jury certain code words used on the calls when discussing the drug transactions.[8]  (See, e.g., Doc. No. 5-5 at 57:2-8, 58:10-17, 91:8-23.)

In addition to the interpretations by Contreras and Baez-Betances, Respondents also called Trooper Greenawald to testify as an expert witness on the recorded phone calls.  (See Doc. No. 32 at 49:5-7.)  However, Trooper Greenawald's testimony identifying Petitioner's voice on the recorded phone calls and interpreting several calls he believed referenced drug deliveries was based on the information provided by Contreras and Baez-Betances.  For instance, the recorded phone calls were mostly in Spanish and Trooper Greenawald did not speak Spanish.[9]  (See id. at 53:4-6.)  And while the calls were initially translated from Spanish to English by bilingual law enforcement officers, it was Contreras and Baez-Betances who confirmed for Respondents the coded meanings behind what was said on the phone calls.  (See id. at 50:12-13, 51:10-12.)  Thus, as ADA Kelecic agreed at the evidentiary hearing, Trooper Greenawald's expert testimony at trial on the meaning of the phone calls was reliant on the interpretations by Contreras and Baez-Betances.  (See id. at 53:4-6.)

Moreover, during his testimony, Contreras also testified that he would store Petitioner's cocaine at his house at Petitioner's request and had occasionally purchased cocaine from Petitioner. (Doc. No. 5-5 at 53:17-21, 54:12-16.)  Baez-Betances testified that he periodically worked for

---

[8]  As mentioned above, Contreras testified in Spanish and an interpreter repeated what he said in English.

[9]  Notably, Detective George Tavares, one of the bilingual law enforcement officers who initially translated the calls from Spanish to English, did testify for Respondents at Petitioner's trial. (See Doc. No. 32 at 49:15; Doc. No. 1 at 22, 28.)  However, his testimony did not cover what was said on the recorded phone calls.  (See id. at 22-23, 28.)

Petitioner, sometimes delivering drugs at Petitioner's request, sometimes driving Petitioner around, and, on one occasion, taking over Petitioner's entire drug operation while Petitioner was out of town. (See, e.g., id. at 87:15-17, 88:18019, 89:21-23, 96:16-25, 97:17-19.) Despite their testimony tying Petitioner to the drug operation, however, no drugs were found in Petitioner's possession nor in his house or car. (See Doc. No. 1 at 34.) Furthermore, while Contreras testified that he kept cocaine for Petitioner at his house, no cocaine was found in Contreras's house when it was searched by law enforcement. (Id. at 24.)

Through this context, it is apparent that any evidence that could have been used to impeach the testimony of Contreras and Baez-Betances would have been material. Respondents argue such evidence is not material because the credibility of Contreras and Baez-Betances had already been impeached because they had both admitted to the charges pending against them as well as to their role in the drug enterprise. (See Doc. No. 37 at 18.) While this may be the case, the Court cannot conclude that further impeachment evidence, namely the information that Contreras and Baez-Betances were testifying pursuant to understandings of significant leniency with Respondents, would not have served to "undermine confidence in the verdict." See Wearry, 577 U.S. at 392 (finding that "any juror who found [one witness] more credible in light of [a second witness's] testimony might have thought differently had she learned that [the second witness] may have been motivated to come forward . . . by the possibility of a reduced sentence on an existing conviction"); see also Napue, 360 U.S. at 394 (finding that, even though the prosecution had made no binding promises, a witness's attempt to obtain a deal before testifying was material because the jury "might well have concluded that [the witness] had fabricated testimony in order to curry the [prosecution's] favor").

39

As the Supreme Court put it, "[e]ven if the jury—armed with all of this new evidence—could have voted to convict [Petitioner], we have no confidence that it would have done so." Wearry, 577 U.S. at 394 (emphasis in original, internal quotations and citation omitted). Accordingly, the evidence of Respondents' understandings of leniency with Contreras and Baez-Betances is material.

### B.     Petition Is Timely Under 28 U.S.C. § 2244(d)(1)(D)

Next, because both Petitioner's Brady/Giglio claim concerning Contreras's guilty plea and his Brady/Giglio claim concerning Baez-Betances's guilty plea are timely, the Petition is timely under 28 U.S.C. § 2244(d)(1)(D).  As mentioned above, Petitioner's Brady and Giglio claim initially focused on Respondents' nondisclosure of Contreras's guilty plea and plea agreement. (See Doc. Nos. 1, 8, 10.)  He only added the nondisclosure of Baez-Betances's guilty plea to his Brady and Giglio argument in the Supplemental Memorandum filed on March 2, 2025.  (See Doc. No. 35.)  Due to this delay, the Court will first discuss the timeliness of Petitioner's Brady and Giglio claim stemming from the nondisclosure of Contreras's guilty plea and plea agreement, before discussing the timeliness of Petitioner's Brady and Giglio claim stemming from the nondisclosure of Baez-Betances's guilty plea and plea agreement.

### 1.     Petitioner's Brady and Giglio Claim Concerning Contreras's Guilty Plea is Timely

Because Petitioner was not aware of Contreras's guilty plea before November 2022, was entitled to presume that such a plea did not exist, and filed the Petition for a Writ of Habeas Corpus within one month of learning about the guilty plea and plea agreement, Petitioner's Brady and Giglio claim stemming from the nondisclosure of Contreras's guilty plea is timely under § 2244(d)(1)(D).  As discussed above, before the Court can grant a petitioner relief pursuant to a petition for a writ of habeas corpus, the petition must be timely.  See 28 U.S.C. § 2244(d).  To be

timely, a petition for a writ of habeas corpus must be brought within one year of any of the following occurrences:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).

Concerning § 2244(d)(1)(D), the Third Circuit Court of Appeals has held that "to satisfy [the] 'due diligence' standard, a prisoner must exercise 'reasonable diligence in the circumstances.'" Wilson v. Beard, 426 F.3d 653, 660 (3d Cir. 2005). Under this standard, "the one-year period of limitation commences . . . when the factual predicate of a claim could have been discovered through the exercise of due diligence, not when it actually was discovered." Schlueter v. Varner, 384 F.3d 69, 74 (3d Cir. 2004). "The requisite 'factual predicate' of a claim is the set of 'vital facts' underlying the claim." Champney v. Sec'y Pa. Dept. of Corrs., 469 F. App'x 113, 116 (3d Cir. 2012).

Here, Petitioner argues that his Brady and Giglio claim concerning the nondisclosure of Contreras's guilty plea contained in the initial Petition is timely under § 2244(d)(1)(D) because it was filed less than a year after he discovered the factual predicate of his claim. (See Doc. No. 9 at 3; Doc. No. 35 at 3.) Specifically, he asserts that he filed the Petition within one year of discovering through the "Reading man pleads guilty in cocaine-trafficking case" article that

Respondents failed to disclose its favorable plea agreement with Rafael Contreras.  (See id. at 3-4.)  Based on this article, the factual predicate of Petitioner's claim is the vital fact that Contreras had entered into a plea deal with the Berks County DA.  Petitioner claims he became aware of the article, and thus the factual predicate of his claim, on November 11, 2022, when the lawyer he hired to litigate his federal habeas corpus petition showed him the article.  (See id.)  The Petition for a Writ of Habeas Corpus was filed less than one month later, on December 1, 2022.  (See Doc. No. 1.)

In the Report and Recommendation ("R&R"), however, the Magistrate Judge rejected this argument and found that the petition was untimely.  (See Doc. No. 9.)  In coming to this conclusion, she noted that Petitioner did not "explain why he could not have become aware of [the evidence of Contreras's plea deal] back when Contreras pled guilty, in February 2017" or at any other time prior to November 11, 2022.  (Id. at 3.)  Thus, the Magistrate Judge held that because "Petitioner has utterly failed to address when, through the exercise of due diligence, he could have learned the crucial evidence, . . . he has failed to demonstrate the applicability of § 2244(d)(1)(D)."  (Id. at 4.)  Based on this conclusion, the Magistrate Judge instead assessed whether the Petition was filed within one year of "the date on which the judgment became final" under § 2244(d)(1)(A) and found that, under this analysis, the Petition was almost three years late.  (Id.)  Moreover, the Magistrate Judge also concluded that statutory and equitable tolling did not apply and thus recommended that the Court dismiss the Petition as untimely.  (Id. at 5.)

This Court, however, disagrees with the Magistrate Judge's conclusion that § 2244(d)(1)(D) does not apply and, accordingly, will not approve and adopt the findings in the R&R.  Petitioner satisfied § 2244(d)(1)(D)'s due diligence requirement by exercising "reasonable diligence in the circumstances."  As mentioned above, the factual predicate for Petitioner's claim

is the fact that Contreras entered into a plea deal with the Berks County DA.  And Petitioner first became aware of this plea deal through the "Reading man pleads guilty in cocaine trafficking case" article on November 11, 2022 when his first habeas counsel showed him the article.  The Petition was then filed on December 1, 2022, less than one month later.

At the February 5, 2025 evidentiary hearing, Petitioner explained why he did not discover the article until November 11, 2022, testifying that he has been in prison and not had access to a computer since February 2, 2017, the date he entered the state's custody.  (See Doc. No. 32 at 8:22-10:10.)  The article reporting that Contreras had entered a plea deal was not published until February 15, 2017, almost two weeks after Petitioner entered prison and lost access to the Internet.  (See Doc. No. 14 at 3.)  Thus, because he has been in custody and not had access to the Internet since February 2, 2017, Petitioner was unable to scour the Internet for articles reporting that witnesses who testified against him had entered into plea deals with the prosecution.  Given that Petitioner filed the Petition less than one month after he became aware of such an article, he exercised "reasonable diligence in the circumstances."

Respondents argue that because Petitioner was represented by the same counsel during his trial and post-trial appellate process, and this trial counsel would have had access to the Internet and to Contreras's docket, Petitioner did not exercise reasonable diligence in discovering the Berks County DA's alleged violation of Brady and Giglio.  But this argument contradicts the Third Circuit's holding in Bracey v. Superintendent Rockview SCI, 986 F.3d 274 (3d Cir. 2021).  There, the habeas petitioner, Bracey, was convicted of murder in 1995 in Pennsylvania state court.  Bracey, 896 F.3d at 279.  To obtain this conviction, the prosecution relied heavily on the testimony of two cooperators.  Id.  While the prosecution disclosed to the jury that the cooperators had received favorable plea agreements in exchange for their testimony, it failed to disclose the extent

of the plea agreements.  Id.  Following his 1995 conviction, Bracey did not learn the full extent of the cooperators' plea agreements until October 2010, fifteen years later.  Id.

When he became aware that the prosecution had failed to advise him or the jury on the full extent of the cooperator's plea agreements, Bracey filed a state habeas petition under Brady and Giglio.  Id.  And after his state habeas petition was dismissed as untimely, Bracey filed a federal habeas petition.  See id. at 280.  However, the District Court also dismissed Bracey's federal habeas petition as untimely, concluding that "because the full extent of the plea agreements and the sentences received by the witnesses were a matter of public record, Bracey could have found the factual predicate of [his Brady] claim through the exercise of due diligence well before October 2010, meaning that he had filed his petition more than one year after the 'factual predicate' for his Brady claim could have been discovered through the exercise of due diligence."  Id. (citing 28 U.S.C. § 2244(d)(1)(D)) (alteration in original, quotations and citation omitted).

Three years after his federal habeas petition was dismissed, Bracey moved for reconsideration based on the Third Circuit's holding in Dennis v. Secretary, Pennsylvania Department of Corrections that "the concept of 'due diligence' plays no role in the Brady analysis." See id.; Dennis, 834 F.3d at 291.  After the District Court denied reconsideration, the Third Circuit granted Bracey's certificate of appealability in order to consider the applicability of its holding in Dennis to § 2244(d)(1)(D)'s due diligence requirement.  Bracey, 986 F.3d at 281.  It recognized that Dennis held "[t]here is no 'affirmative due diligence duty of defense counsel as part of Brady' and 'no support [for] the notion that defendants must scavenge for hints of undisclosed Brady material.'"  Id. at 289.  In the context of § 2244(d)(1)(D), it concluded that Dennis's holding "altered what a petitioner in Bracey's position would [have] reasonably expect[ed] about the possibility of undisclosed Brady material."  Id. at 291 (alteration in original, quotations and citation

omitted).  Thus, the <u>Bracey</u> court held that where a habeas petitioner is alleging a <u>Brady</u> violation, "[the] petitioner's failure to search for <u>Brady</u> material of which he is unaware and which he is entitled to presume is non-existent does not fall short of the diligence required by § 2244(d)(1)(D)." <u>Id.</u>

Here, because Petitioner and his trial counsel were unaware of the allegedly undisclosed <u>Brady</u> and <u>Giglio</u> material, <u>i.e.</u>, Contreras's guilty plea and plea agreement, and were entitled to presume that such undisclosed <u>Brady</u> material was non-existent, Petitioner's failure to become aware of Contreras's guilty plea until November 2022 "does not fall short of the diligence required by § 2244(d)(1)(D)."  <u>See id.</u>  While Respondents seem to suggest that Petitioner's trial counsel should have been aware that Contreras had entered into a favorable guilty plea because Contreras was a co-defendant in the same drug enterprise as Petitioner and trial counsel "could easily have reviewed the public docket to discover the date and terms of Contreras's plea, if [he] did not see the newspaper article," this argument improperly places the burden of discovering <u>Brady</u> material on Petitioner's trial counsel.  (<u>See</u> Doc. No. 37 at 9.)  Instead, as the Third Circuit held in <u>Dennis</u> and recognized in <u>Bracey</u>, "the defense 'is entitled to presume that prosecutors have discharged their official duties' by sharing all material exculpatory information in their possession, and the defense's diligence in seeking out exculpatory material on its own 'plays no role in the <u>Brady</u> analysis.'"  <u>Bracey</u>, 986 F.3d at 289 (quoting <u>Dennis</u>, 834 F.3d at 291).

Thus, because Petitioner was not aware of Contreras's guilty plea until November 2022, was entitled to presume that such a plea was non-existent, and filed the Petition for a Writ of Habeas Corpus within one month of learning about the guilty plea, Petitioner's <u>Brady</u> and <u>Giglio</u> claim stemming from the nondisclosure of Contreras's guilty plea is timely under § 2244(d)(1)(D).

### 2. Petitioner's <u>Brady</u> and <u>Giglio</u> Claim Concerning Baez-Betances's Guilty Plea is Timely

Similarly, because Petitioner was not aware of Baez-Betances's guilty plea before June 10, 2024, was entitled to presume that such a plea did not exist, and added the nondisclosure of Baez-Betances's guilty plea to his <u>Brady</u> and <u>Giglio</u> argument through the Supplemental Memorandum within one year of discovering such guilty plea and plea agreement, Petitioner's <u>Brady</u> and <u>Giglio</u> claim stemming from the nondisclosure of Baez-Betances's guilty plea is timely under § 2244(d)(1)(D).  As mentioned above, Petitioner did not initially include the nondisclosure of Baez-Betances's guilty plea and plea agreement in his <u>Brady</u> and <u>Giglio</u> claimsF made in the Petition.  While he became aware of Contreras's guilty plea and plea agreement in November 2022 through the article, Petitioner was not yet aware of Baez-Betances's guilty plea and plea agreement when he filed the Petition in December 2022.  In fact, Petitioner did not become aware of Baez-Betances's guilty plea and plea agreement until June 2024, when the Court ordered discovery on the Petition.  (<u>See</u> Doc. Nos. 11, 16.)

Specifically, on March 7, 2024, after reviewing the R&R, the Court ordered Respondents to supplement the record by producing certain documents, including the written guilty plea agreements of both Contreras and Baez-Betances.  (<u>See</u> Doc. No. 11.)  Respondents complied with this Order on June 10, 2024, filing the written plea agreements on the record.  (<u>See</u> Doc. No. 16.)  It was through this document production that Petitioner first learned of Baez-Betances's guilty plea and plea agreement.  As such, on March 2, 2025, after the Court granted the parties leave to file supplemental memoranda following the evidentiary hearing, Petitioner filed a Supplemental Memorandum adding the nondisclosure of Baez-Betances's guilty plea and plea agreement to his <u>Brady</u> and <u>Giglio</u> argument.  (<u>See</u> Doc. No. 35.)

Thus, for the same reasons stated above, because Petitioner was not aware of Baez-Betances's guilty plea before June 10, 2024, was entitled to presume that such a plea did not exist under <u>Dennis</u> and <u>Bracey,</u> and added the nondisclosure of Baez-Betances's guilty plea to his <u>Brady</u> and <u>Giglio</u> argument through the Supplemental Memorandum within one year of discovering such guilty plea and plea agreement, Petitioner's <u>Brady</u> and <u>Giglio</u> claim stemming from the nondisclosure of Baez-Betances's guilty plea and plea agreement is timely under § 2244(d)(1)(D).

### C.    Petitioner Satisfied the Exhaustion Requirement

Finally, while Petitioner did not exhaust the state court remedies on his <u>Brady</u> and <u>Giglio</u> claim and is now procedurally barred from bringing the claim in the Pennsylvania state courts, he has nevertheless satisfied the exhaustion requirement by demonstrating cause for the procedural default and actual prejudice as a result of the alleged <u>Brady</u> and <u>Giglio</u> violation. As discussed above, in addition to determining whether the petition is timely, a reviewing court must determine whether the petitioner exhausted "the remedies available in the courts of the State" before bringing the petition for a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b)(1)(A). A petitioner exhausts the remedies available in state court when he has fully presented his claims to the highest state court. <u>See</u> <u>Whitney v. Horn</u>, 280 F.3d 240, 250 (3d Cir. 2002). But because "[t]his requirement . . . refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." <u>Gray v. Netherland</u>, 518 U.S. 152, 161 (1996) (alterations in original, internal quotations and citations omitted). However, since "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence," a federal court cannot review a procedurally defaulted claim "unless the [petitioner] can [(1)] demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or [(2)]

demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Id.; Coleman v. Thompson, 501 U.S. 722, 750 (1991).

"'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." Coleman, 501 U.S. at 753. "Actual prejudice" requires a showing "not merely that the errors at [the petitioner's] trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982). Moreover, a fundamental miscarriage of justice occurs only "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." See Murray v. Carrier, 477 U.S. 478, 496 (1986).

### 1.    Petitioner Failed to Exhaust the <u>Brady</u> and <u>Giglio</u> Claim in State Court

As an initial matter, Petitioner did not exhaust the remedies available in Pennsylvania state court on the Brady and Giglio claim. While he did file a counseled petition under Pennsylvania's Post-Conviction Collateral Relief Act ("PCRA"), he only challenged the assistance of his trial counsel for failing to call character witnesses. (See Doc. No. 5 at 2-3.) He did not raise the Brady and Giglio issue in this PCRA petition. Instead, Petitioner raised the Brady and Giglio issue for the first time in the instant federal Petition for a Writ of Habeas Corpus. (See Doc. No. 1.) Thus, by not raising the Brady and Giglio claim in Pennsylvania state court before filing the Petition, Petitioner failed to exhaust the available state court remedies.

### 2.    Petitioner's <u>Brady</u> and <u>Giglio</u> Claim is Procedurally Defaulted in State Court

However, even if Petitioner were to attempt to exhaust the Pennsylvania state court remedies by filing a PCRA petition asserting the Brady and Giglio claim, the state courts would

dismiss the claim as procedurally defaulted.  See Commonwealth v. Ahlborn, 699 A.2d 718, 721 (Pa. 1997) (explaining that in Pennsylvania, a PCRA petition "is the only collateral means by which [a defendant] can challenge his conviction").  Procedural default of a federal claim in state court occurs when either (1) the petitioner raised the federal claim in state court but the claim was dismissed due to a state procedural rule, or (2) the petitioner did not raise the federal claim in state court but, even if he did, the state court would dismiss it because of a state procedural rule.  See Coleman, 501 U.S. at 728.  Under Pennsylvania law, a PCRA petition is subject to the following limitation:

> (b)  Time for filing petition.—
>
> (1)  Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>
> > (i)  the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
> >
> > (ii)  the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
> >
> > (iii)  the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.
>
> (2)  Any petition invoking an exception provided in paragraph (1) shall be filed within one year of the date the claim could have been presented.
>
> (3)  For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.

42 Pa. Cons. Stat. § 9545(b)(1)-(3).

Here, because more than a year has passed since the judgment against Petitioner became final and none of the exceptions to the one-year limitation period listed in § 9545(b)(1)(i)-(iii) apply, Petitioner's Brady and Giglio claim is procedurally defaulted.  Petitioner filed a timely notice of appeal challenging his conviction on March 15, 2017 and, on November 7, 2018, the Pennsylvania Superior Court denied the appeal.  (See Doc. No. 5 at 2.)  Under Pennsylvania law, Petitioner had 30 days from the denial of his appeal to file a petition for allowance of appeal.  See 210 Pa. Code R. 1113(a).  Thus, because Petitioner did not file a petition seeking allowance of appeal, the judgment against Petitioner became final on December 7, 2018, i.e., 30 days after the Superior Court denied his appeal.  As such, Petitioner only had until December 7, 2019, one year after the judgment against him became final, to file any subsequent PCRA petitions.  Because it is now well past December 7, 2019, any petition filed now would be dismissed as untimely unless Petitioner can qualify for one of the three exceptions identified in § 9545(b)(1)(i)-(iii).

However, none of the exceptions to the one-year limitation period for filing PCRA petitions apply to Petitioner's Brady and Giglio claim.  Under the first exception, Pennsylvania state courts will consider a PCRA petition that is otherwise untimely when the petitioner's "failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States."  42 Pa. Cons. Stat. § 9545(b)(1)(i).  But here, Petitioner did not fail to raise the Brady and Giglio claim due to interference by government officials.  Instead, he did not raise the claim within the one-year limitation period because he did not know of the facts giving rise to the claim until nearly three years after the limitation period expired.  As such, the first exception does not apply to Petitioner's Brady and Giglio claim.

Under the second exception, Pennsylvania state courts will consider a PCRA petition that is otherwise untimely where "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 PA. CONS. STAT. § 9545(b)(1)(ii). Here, while this exception may have applied to the Brady and Giglio claim under the same reasoning the Court applied, supra, when discussing the timeliness of Petitioner's federal habeas petition, Pennsylvania law also applies a one-year limitation period for filing PCRA petitions pursuant to one of the exceptions listed in in § 9545(b)(1)(i)-(iii). See 42 PA. CONS. STAT. § 9545(b)(2) ("Any petition invoking an exception provided in paragraph (1) shall be filed within one year of the date the claim could have been presented.")

Under the limitation in § 9545(b)(2), Petitioner had one year from November 11, 2022, the date on which he discovered the facts upon which his Brady and Giglio claim is predicated, to file a PCRA petition pursuant to the exception in § 9545(b)(1)(ii). Because he did not do so and it has now been more than a year since November 11, 2022, Petitioner's Brady and Giglio claim is procedurally defaulted under the exception outlined in § 9545(b)(1)(ii). See Slutzker v. Johnson, 393 F.3d 373, 380 (3d Cir. 2004) (finding that the petitioner's Brady claim was procedurally defaulted because, while the petitioner discovered the suppressed Brady evidence during discovery on his federal habeas petition, he did not move to stay or dismiss the federal petition so as to file a PCRA petition on the Brady claim within the time period allotted for filing a PCRA petition on newly discovered evidence, thus rendering the Brady claim procedurally defaulted). Accordingly, the second exception does not apply to Petitioner's Brady and Giglio claim.

Lastly, under the third exception, the Pennsylvania state courts will consider a PCRA petition that is otherwise untimely where "the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after

the time period provided in this section and has been held by that court to apply retroactively." 42 PA. CONS. STAT. § 9545(b)(1)(iii).  Here, while the right asserted by Petitioner was recognized by the United States Supreme Court, this right was recognized before, rather than after, the one-year limitation period for filing a PCRA petition expired.  The right asserted by Petitioner is his Fourteenth Amendment right to Due Process recognized by the United States Supreme Court in Brady and Giglio.  See Brady, 373 U.S. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); see also Giglio, 405 U.S. at 154 (extending Brady to impeachment evidence, that is, evidence tending to undermine a witness's credibility, such as a promise made by the prosecution to its key witness that the witness would not be prosecuted if he testified for the prosecution).  But the Brady decision was issued in 1963 and Giglio was issued in 1972, both decades before the judgment against Petitioner became final in December 2018.  Therefore, the third exception does not apply to Petitioner's Brady and Giglio claim.

### 3.    Petitioner Demonstrated Cause for the Default and Actual Prejudice as a Result of the Brady and Giglio Violation

Finally, while Petitioner's Brady and Giglio claim is procedurally defaulted, he has nevertheless satisfied the exhaustion requirement by demonstrating sufficient cause for the default as well as actual prejudice as a result of the Brady and Giglio violation.  As stated above, typically "'cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." Coleman, 501 U.S. at 753.  And "actual prejudice" requires a showing "not merely that the errors at [the petitioner's] trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982).

That said, the United States Supreme Court has devised a separate cause and prejudice test for procedurally defaulted <u>Brady</u> claims.  <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263 (1999); <u>Banks v. Dretke</u>, 540 U.S. 668 (2004).  In such cases, because the cause and prejudice analysis parallels "two of the three components of the alleged <u>Brady</u> violation," a petitioner satisfies the cause and prejudice test by showing (1) that the prosecution suppressed <u>Brady</u> evidence, and (2) that the suppressed <u>Brady</u> evidence was material.  <u>See</u> <u>Strickler</u>, 527 U.S. at 282 ("[C]ause and prejudice parallel two of the three components of [an] alleged <u>Brady</u> violation . . . The suppression of the [<u>Brady</u> evidence] constitutes one of the causes for the failure to assert a <u>Brady</u> claim in the state courts, and unless those documents were 'material' for <u>Brady</u> purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default."); <u>see also</u> <u>Banks</u>, 540 U.S. at 691 ("Corresponding to the second <u>Brady</u> component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was [due to] the State's suppression of the relevant evidence; coincident with the third <u>Brady</u> component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for <u>Brady</u> purposes.")  Put differently, "[a] colorable <u>Brady</u> claim can satisfy the requisite showing of cause and prejudice."  <u>Johnson v. Kerestes</u>, 683 F. Supp. 3d 452, 466 (E.D. Pa. 2023) (citing <u>Banks</u>, 540 U.S. at 698-99).

Here, because the Court concluded, <u>supra</u>, that Petitioner's <u>Brady</u> and <u>Giglio</u> claim had merit, he has satisfied the cause and actual prejudice requirement to proceed with his procedurally defaulted <u>Brady</u> and <u>Giglio</u> claim.  In short, the Court found above that Respondents suppressed <u>Brady</u> and <u>Giglio</u> evidence when it did not disclose its understandings of leniency with Contreras and Baez-Betances to the jury.  Next, it found that because the evidence of these understandings of leniency could have been used as impeachment evidence against Contreras and Baez-Betances,

it was favorable to the defense.  And finally, the Court found that because evidence of Respondents' understandings of leniency could have affected the judgment of the jury, it is material. Accordingly, by satisfying the cause and actual prejudice requirement through demonstrating the merits of his <u>Brady</u> and <u>Giglio</u> claim, Petitioner has satisfied the exhaustion requirement.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant the Petition for a Writ of Habeas Corpus (Doc. No. 1), not approve and adopt the Report and Recommendation (Doc. No. 9), and sustain Petitioner's Objections to the Report and Recommendation (Doc. No. 10).  An appropriate Order follows.